# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

═══════════════
## NO. 03-05-00355-CV
═══════════════


Austin Chevrolet, Inc. d/b/a Munday Chevrolet/Geo and
General Motors Corporation, Appellants

v.

Motor Vehicle Board and Motor Vehicle Division of the Texas Department of
Transportation and Landmark Chevrolet Corporation, Appellees


═══════════════════════════════════════════════════════════════════════
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. GN500875, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING
═══════════════════════════════════════════════════════════════════════


## O P I N I O N


This is an appeal from a final order issued by the Motor Vehicle Board of the Texas

Department of Transportation[1] in a *Subaru* proceeding.[2]  *See Subaru of Am., Inc. v. David McDavid*

---

[1] The Board was abolished in 2005.  *See* Act of May 30, 2005, 79th Leg., R.S., ch. 281, § 7.01, sec. 2301.002(2), (10), 2005 Tex. Gen. Laws 778, 839.  We will, however, continue to refer to the Board as it issued the order under review.  The Motor Vehicle Division of the Texas Department of Transportation is now headed by a division director.  *See id.*

[2] A *Subaru* proceeding is required when a party files suit in district court, but includes claims within the Board's exclusive jurisdiction under the Texas Occupations Code as issues to be decided in the lawsuit.  As the supreme court concluded in *Subaru*, the district court lacks jurisdiction to consider code-based claims falling within the Board's exclusive jurisdiction and should abate the trial proceedings to allow this jurisdictional defect to be cured by presenting those claims to the Board for review and final decision.  *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 227-28 (Tex. 2002).  Once the Board renders a final decision on the code-based claims, the parties may then utilize the Board's findings for purposes of the lawsuit.  *Id.* at 228.

*Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002). In this case, Landmark Chevrolet Corporation (Landmark) filed a lawsuit against General Motors Corporation (GM) and Austin Chevrolet, Inc., d/b/a Munday Chevrolet/Geo (Munday) (together "GM/Munday"), alleging that GM defrauded Landmark out of its right to protest[3] Munday's dealership application in 1993 and discriminated against Landmark in the allocation of Suburbans and Tahoes from 1994 to 1997. The district court abated the suit and referred these two issues to the Board for determination. *See* Tex. Occ. Code Ann. §§ 2301.151, .251-.266 (West 2004); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 206 (Tex. 2002); *Subaru*, 84 S.W.3d at 223. After an administrative law judge (ALJ) conducted a hearing and prepared a proposal for decision (PFD), the Board ruled for Landmark on the first issue and for GM/Munday on the second issue.

GM/Munday now appeal the issue decided in favor of Landmark, contending that the Board acted in an arbitrary and capricious manner by refusing to answer the question posed by the district court and by ignoring the Board's precedent. We affirm the Board's order.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises out of a dispute over the establishment and relocation of the Munday dealership in the north Houston area. In 1993, Munday filed an application with the Board

---

[3] A new car dealer may protest a manufacturer's decision to establish a new car dealership of the same line-make within a fifteen-mile radius of the existing dealership. *See* Tex. Occ. Code Ann. § 2301.652(b)(2) (West 2004).

for a new franchised motor vehicle dealer's license for a dealership to be located in northwest Houston, at F.M. 1960 and Cypress Station Drive, approximately one-half mile west of Interstate Highway 45. This application was timely protested by Landmark, a large-volume dealership located ten miles south of the proposed Munday location on Interstate Highway 45. GM intervened in the protest proceeding on Munday's behalf. A pretrial conference was held, discovery conducted, and a hearing on the merits was scheduled. Prior to the commencement of the hearing, Landmark dismissed its protest of the Munday application after, it contends, it was assured that GM would give consideration to Landmark's concerns about the proposed dealership. The Board then issued a license to Munday. Soon after, Munday completed construction of the dealership and commenced operations.

In 1997, Munday filed an application with the Board to relocate the dealership directly onto Interstate Highway 45. Landmark filed this lawsuit against GM/Munday, alleging, among other things, that GM defrauded Landmark out of its right to protest Munday's 1993 application. Landmark alleged that GM was biased in the 1993 matter because GM had conditioned its offer of the Chevrolet franchise to Munday on Munday's purchase, for above-market value, of the GM-owned property at F.M. 1960 and Cypress Station Drive.

On motions filed by GM/Munday, the district court abated the suit and referred the matter to the Board to answer the following question at issue in this appeal:

> If Landmark had not withdrawn its protest of the license application at issue in William F. Munday d/b/a Bill Munday Chevrolet/Geo, Applicant v. Landmark Chevrolet Corp., Protestant and General Motors Corporation, Intervenor, before the Texas Department of Transportation, Division of Motor Transportation; Docket No.

3

93-094, under § 4.06(c) of the Texas Motor Vehicle Commission Code,[4] would Landmark have obtained a final order denying the license application?[5]

This abatement was predicated upon decisions issued by the supreme court in *Butnaru* and *Subaru*, wherein the court determined that the Board has the exclusive jurisdiction to determine violations of the motor vehicle code. *See Butnaru*, 84 S.W.3d at 206; *Subaru*, 84 S.W.3d at 223. Following the district court's abatement, Landmark initiated a contested-case proceeding by filing a complaint with the Board against GM/Munday so the Board could answer the district court's question. The role of the Board in this matter was to interpret the code so that the district court could determine if damages were to be assessed against GM/Munday. *See Subaru*, 84 S.W.3d at 224.

In the contested-case proceeding, GM/Munday had the burden to show good cause for the establishment of the new Munday dealership pursuant to § 2301.652(a) of the occupations code, which states,

(a) The board may deny an application for a license to establish a dealership if, following a protest, the applicant fails to establish good cause for establishing the dealership. In determining good cause, the board shall consider:

(1) whether the manufacturer or distributor of the same line-make of new motor vehicle is being adequately represented as to sales and service;

[4] The former Texas Motor Vehicle Commission Code, the Board's enabling statute, was codified at Chapter 2301 of the Texas Occupations Code, effective on June 1, 2003. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 1421, § 5, sec. 2301, 2001 Tex. Gen. Laws 2570, 4921-68. The Board order under review involved the "protest" provision in the 1993 version of the Motor Vehicle Commission Code. Although codification altered the numbering system, the relevant portions of the protest provision have not changed. We will refer to the current code provisions, unless otherwise stated.

[5] The district court referred a second question to the Board, but that question is not at issue in this appeal.

>    (2)  whether the protesting franchised dealer representing the same line-make of new motor vehicle is in substantial compliance with the dealer's franchise to the extent that the franchise is not in conflict with this chapter;
>
>    (3)  the desirability of a competitive marketplace;
>
>    (4)  any harm to the protesting franchised dealer; and
>
>    (5)  the public interest.

*See* Tex. Occ. Code Ann. § 2301.652(a) (West 2004). The second factor was not in dispute; the other four factors were contested.

The Board found that GM/Munday failed to prove good cause for the addition of the Munday dealership. As a result, the Board found that if Landmark had not withdrawn its protest of Munday's license application in 1993, its protest would have been granted and Munday's application would have been denied. GM/Munday filed an administrative appeal in district court and Landmark removed the appeal to this Court pursuant to section 2301.751(b) of the occupations code. *See id.* § 2301.751(b) (West 2004).

## ANALYSIS

### *The Controversy*

GM/Munday contend that after the parties had agreed to refer the question to the Board, the Board improperly recast the question. GM/Munday further contend that the Board improperly excluded evidence, specifically the testimony of the former executive director of the Board, which it sought to proffer. GM/Munday also argue that, in analyzing the statutory good-cause factors on harm and adequacy of representation, the Board abandoned precedent and penalized

5

GM/Munday for using a previously approved standard, thus violating their due process and equal protection rights.

Landmark and the Board respond that the Board properly conducted the proceedings and that its decision was supported by substantial evidence.

***Standard of Review***

We review the Board's decision under the substantial-evidence standard. Tex. Occ. Code Ann. § 2301.751(a); *see* Tex. Gov't Code Ann. § 2001.174 (West 2000); *Subaru*, 84 S.W.3d at 224. "'Broadly speaking, the substantial evidence rule is a court review device to keep the courts out of the business of administering regulatory statutes enacted by the Legislature; but it remains the business of the courts to see that justice is administered to competing parties by governmental agencies.'" *Board of Regents v. Martine*, 607 S.W.2d 638, 641 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.) (quoting *Lewis v. Metropolitan Savs. and Loan Ass'n*, 550 S.W.2d 11, 13 (Tex. 1977)).

Under a substantial-evidence review, we presume that the Board's order is supported by substantial evidence, and the appellant has the burden of overcoming this presumption. *Graff Chevrolet Co., Inc. v. Texas Motor Vehicle Bd.*, 60 S.W.3d 154, 159 (Tex. App.—Austin 2001, pet. denied). When a court is applying the substantial-evidence standard of review to an agency decision, the issue for the reviewing court is not whether the agency's decision was correct, but whether the record demonstrates some reasonable basis for the agency's action. *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). We may not substitute our judgment for that of the agency on matters committed to agency discretion. Tex.

Gov't Code Ann. § 2001.174; *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.,* 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied). The agency is the sole judge of the weight of the evidence and the credibility of the witnesses. *Central Power & Light*, 36 S.W.3d at 561.

### District Court's Question

In its first and second issues, GM/Munday contend that the Board improperly recast the district court's issue as "what would have happened had it taken the parties to 2002 to get to hearing, but with evidence of market data beyond 1993 excluded?" GM/Munday assert that by recasting the case in this manner, and by excluding the testimony of the former executive director of the Board in 1993, the Board "engaged in an irrelevant thought experiment" that failed to answer the question posed by the district court.

We disagree. In this case, the district court's order did not instruct the Board on methodology; rather, it properly deferred to the Board's authority and expertise in determining whether there was good cause to add the Munday dealership in 1993. In deferring to the Board, the district court followed the guidance of the supreme court in *Subaru*. *See Subaru,* 84 S.W.3d at 221.

In *Subaru,* the court stated, "Trial courts should allow an administrative agency to initially decide an issue when: (1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations . . . ." *Id*. In the district court's order, it sought the Board's "special competence, expertise and experience" in interpreting and applying the code to cases involving the proposed addition of a dealership to a market. The order recognized that the Board and its staff regularly deal with the questions raised in the issue in their administration of

protest proceedings, and that the Board had developed rules for determining such issues, had expertise in applying those rules, and had made prior decisions on applications for the addition of a dealership into a market.

GM/Munday contend that the proper way to answer this question was to determine how Board members sitting at that time would have ruled after considering the evidence and witnesses that would have been presented in 1993. We disagree. The inquiry proposed by GM/Munday would have been beyond the Board's jurisdiction because it is not authorized by the former motor vehicle commission code or the occupations code. Furthermore, although the Board has expertise and experience in making the good cause determination in protest proceedings and has developed rules and procedures for these proceedings, it has no expertise, experience, or rules relevant to a determination of how Board members sitting in the past would have reasoned or ruled, or in determining what evidence, witnesses, and theories the parties might have proffered in a past proceeding.

GM/Munday ask the Board to conduct an impossible task, one that it admitted in its pleadings was "too speculative for the Board to definitively answer." If the Board were to have chosen this path, it would have had to resolve many complicating factors. For example, discovery was never completed in the 1993 proceeding, several of the listed experts had not prepared reports when Landmark withdrew its protest, and it is impossible to know when the PFD would have been completed in an effort to determine who would have been on the Board at the time of its consideration. Even if all these complications could be resolved, the final determination would still,

8

in the words of the Board, "inescapably require speculation concerning the subjective mental perceptions of past Board members."

Neither the supreme court in *Subaru* nor the district court here contemplated that the Board would make a determination for which it had no relevant expertise, experience, or rules, nor does the former motor vehicle commission code or the occupations code authorize it. Rather, the district court followed the rationale and language of *Subaru* by asking the current Board to use its authority and expertise, within the Board's sound discretion, to apply the statutory factors and determine whether there was good cause to add the Munday dealership in 1993.[6] *See id.*

### Evidentiary Rulings

In accord with its position that the current Board must step into the shoes of the 1993 Board, GM/Munday contend that the Board erroneously excluded the testimony of Russell Harding, Executive Director of the Motor Vehicle Division from 1975 to 1993, who was prepared to testify that "it was highly unlikely" that Landmark's 1993 protest would have prevailed before the Board as composed in 1993.

We review an agency's rulings on the admission or exclusion of evidence under the abuse of discretion standard we apply to trial courts. *City of Amarillo v. Railroad Comm'n*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied). Specifically, the Board has broad discretion in deciding whether to admit expert testimony in an administrative hearing, and its decision will not be disturbed absent an abuse of discretion. *See Fay-Ray Corp. v. Texas Alcoholic*

---

[6] We do not address the district court's consideration of the Board's order in the pending lawsuit.

*Bev. Comm'n*, 959 S.W.2d 362, 367 (Tex. App.—Austin 1998, no pet.). Because the legislature gave the Board exclusive jurisdiction to determine the issue of good cause, based on its expertise and experience in making this determination, it was, as a matter of law, uniquely and exclusively qualified to make that determination in this case. The question of how best to resolve the issue was a matter for the Board's discretion, and it did not abuse its discretion when it concluded that Harding's testimony was irrelevant to this inquiry. We conclude that the Board acted within its discretion when it rejected Harding's proposed testimony.

GM/Munday further argue that the Board's exclusion of post-1993 market data was error. However, post-1993 market data is irrelevant to a determination of whether good cause existed to add the Munday dealership in 1993. To be sure, post-1993 market data would be irrelevant to GM/Munday's preferred determination—how the Board sitting in 1993 would have ruled. In any event, agencies are afforded broad discretion in admitting and excluding evidence, and it was within the Board's discretion to limit the evidence in this case as it did.

We overrule GM/Munday's first and second issues.

### *Harm*

In demonstrating good cause for the establishment of a new dealership, GM/Munday were required to show that the Munday dealership would not "harm" the protesting franchised dealer. GM/Munday contend that the Board's finding of harm to Landmark based on a lessening of profits is inconsistent with previous Board precedent equating harm with "demise, threatened viability, or significant harm." GM/Munday further contend that there is no evidence of any decrease in sales by Landmark.

10

The Board has addressed harm to protesting dealers where, as here, there is no showing of lost opportunity in any significant quantity beyond that which is already being captured by the existing dealer body. In *Lewisville Cycle Center v. Action Imports and Z Yamaha*, the Board stated, "In evaluating the potential effects of the granting of the application upon the Protestants, it must again be pointed out that there has been no showing of any inadequacy of representation of Yamaha." *See* Texas Dep't of Transp., *Lewisville Cycle Center v. Action Imports and Z Yamaha*, Proc. No. 247, 1, 32 (Motor Vehicle Bd. Aug. 26, 1982) (final order). The Board continued,

> Without some showing that there is an existing untapped market potential available in the Lewisville area which can serve the Applicant and the Protestants without eroding the Protestants' existing market, it is not reasonable to conclude that the granting of the application will not be harmful to the Protestants and therefore the approval of the application would not be in the public interest.[7]

*Id.* at 33.

In the instant case, GM/Munday failed to prove that there was a significant amount of lost opportunity beyond that which was already being captured by the existing dealer body. The Board found a level of opportunity so low that Munday's options, upon entry into the Houston market, were limited to "cannibalization of its closest intrabrand competitors in order to merely survive." As a "high-cost, high-volume dealer," the evidence showed that Landmark's new car sales department had operated at a loss even during its best years, and it had relied on its used car, service,

---

[7] Until 1989, the protest section did not include harm to the protesting dealer as a separate factor to be considered in protest proceedings. Instead, it considered harm as an aspect of "public interest." *See*, *e.g.*, Texas Dep't of Transp., *Voltex Corp d/b/a Nils Sefeldt Volvo v. Barney Garver Motors and Mazda Motors of Am., Inc.,* Proc. No. 126, 1, 25-26 (Motor Vehicle Bd. July 5, 1978) (final order). This section was amended in 1989 to state that the "Board *shall* consider . . . *any* harm to the protesting franchise dealer." *See* Tex. Occ. Code Ann. § 2301.652(4) (emphasis added).

parts and body shop business to maintain its profitability. The Board found that adding Munday to this market in 1993 would have decreased Landmark's low profitability across all departments, and caused it and other dealerships in the market to change their operations in a way that would have resulted in poorer service to the public. The Board further predicted that the addition of Munday to the dealer body in Houston, where sufficient opportunity had not been verified, was likely to have ramifications in all corners of the market, as "dealership operational strategies are altered to the public's detriment in an effort to regain or retain profit."

The Board also found, consistent with precedent, that existing dealers in a market with little to no opportunity should not be forced to reduce service to the public for the benefit of a new dealer. *See*, *e.g.*, Texas Dep't of Transp., *Bill Munday Pontiac, Inc. v. Hendrix GMC Trucks, Inc., et. al.*, Docket No. 80-213, 1, 22 (Motor Vehicle Bd. March 13, 1981) (final order) (if the probable result of the establishment of an additional dealer in the Austin market would be the failure of an existing dealer *or the reduction of service to the public*, then it would not be in the public interest for the Commission to approve the application); Texas Dep't of Transp., *Hudiberg Chevrolet, Inc. v. Frontier GMC, Inc., et. al.*, Docket No. 80-193, 1, 40 (Jan. 8, 1981) (final order) (it would not be in the public interest for the Commission to approve the application if it results in the demise or failure of one or both of the dealerships *or reduction of service to the public*).

GM/Munday cite Board decisions that stand for the proposition that an existing dealer in a flourishing market is not necessarily harmed because it must share the market with a new dealer, even if it means that the existing dealer will profit less after the dealer network expands. *See*, *e.g.*, Texas Dep't of Transp., *Marathon Corp. v. American Kawasaki of Garland, Inc.*, Docket No. 93-159, 1, 20 (Sept. 29, 1994) (final order); Texas Dep't of Transp., *Gene Harmon Ford, Inc. v. David*

12

*McDavid Nissan*, Docket No. 96-151, 1, 22 (Sept. 18, 1997) (final order). Here the Board agreed, stating that if Landmark had been in a flourishing market, the Board would expect Landmark to have adjusted its business strategy to capture untapped opportunity in the market. But this was not the case in 1993.

Furthermore, we disagree with GM/Munday's contention that there is no evidence of any decrease in sales on the part of Landmark. Landmark's expert, Dr. Ernest Manuel, testified in his report that if Munday had been in existence in 1992, the most recent year available for the purposes of this suit, "Landmark's new retail Chevrolet sales would have been from 15 percent to 30 percent lower than they actually were." Dr. Manuel also testified that if Munday were added, Landmark's future sales would be 15% to 30% lower than what they would have been had Munday not been present.

GM/Munday contend that Dr. Manuel's testimony regarding Landmark's future sales is insufficient to prove harm because it proves only that Landmark would have been deprived of increased profits if Munday had been added to the dealer base. We disagree. Dr. Manuel forecast an absolute decline in Landmark's future sales had Munday been added to the market as it existed in 1993.

Landmark elicited testimony that in 1993 the Houston economy and auto market were suffering from an extended decline. Landmark presented the expert report of Dr. M. Ray Perryman that described the state of the economy in the Houston area at the end of 1992 as "sluggish and stagnant." The report further stated that the overriding climate in the Houston area during this period was one of "unemployment and job insecurity," as the unemployment rate in Houston in 1992 reached 7.4%, double the rate in 1980, and the city faced a corresponding decline in the real wages

13

of workers and increase in personal bankruptcy filings. According to the report, new automobile sales, as represented by retail registration data, exhibited a pattern similar to the employment figures. New automobile sales in Houston in 1992 were 20.7% below the sales level in 1984, and new automobile sales in the north Houston area declined in 1991 and 1992. The report concluded that the market was characterized by "a decade of sluggishness, a declining trend in new automobile sales, stagnant wages, substantial layoffs, and only modest growth projections."

Within the context of the sluggish Houston market in 1992, Dr. Manuel testified, "if the [automobile] market were flat or only increasing slightly, then you could have an absolute decline, but if the automobile market is expanding at a rapid rate . . . then we would be looking at a reduction in what Landmark sales would have been otherwise." In other words, Dr. Manuel forecast an absolute decline in future sales by Landmark if Munday was added to the market described in Dr. Perryman's report. Dr. Manuel concluded that a market "did not exist" for Munday's 2,000-plus unit planned new vehicle volume and that the public interest would not have been served by adding Munday's redundant facilities and capital.

Because the Board's holding is consistent with its previous decisions and its statutory duty to consider "*any* harm to the protesting franchise dealer," *see* Tex. Occ. Code Ann. § 2301.652(4) (emphasis added), we overrule GM/Munday's third issue.

### *Adequacy of Representation*

GM/Munday contend that the Board acted arbitrarily when it failed to follow its precedent by rejecting the Texas average adjusted ("TAA") standard for measuring "adequacy of representation" in the Houston market. *See* Tex. Occ. Code Ann. § 2301.652(1). GM/Munday assert

14

that it relied upon this standard in presenting its case on the issue of adequacy of representation, and that, without notice, the Board decided that the standard was flawed and that GM/Munday had not proven their case. The Board responds that the application of a different standard—the Texas multiple dealer area (MDA) standard—was consistent with its precedents, within its discretion, and more appropriate to the Houston market.

The Board has not committed itself to the use of a single standard and has used a variety of standards in its decisions. The standard employed by the Board varies based on the facts and circumstances in each case. *See*, *e.g.*, Texas Dep't of Transp., *John Roberts BMW, Inc. v. Classic Cars, Inc.*, Proc. No. 169, 1, 14 (Motor Vehicle Bd. Sept. 18, 1979) (final order) (BMW national average and top fifteen metropolitan markets average); Texas Dep't of Transp., *Burns Motors v. Ed Payne Motors, Inc.*, Docket No. 00-0001 LIC, 1, 31 (Motor Vehicle Bd. Oct. 18, 2001) (final order) (national and zone averages). GM/Munday acknowledged the Board's use of more than one standard in their motion to the Board for rehearing, which stated, "The Board has never said that any one average or statistical approach must be used," and GM has presented evidence comparing different standards in prior cases before the Board. In recommending a standard in *Jupiter Chevrolet-Geo, Inc. v. Young Chevrolet*, GM, through the same expert that testified before the Board in the instant case, James Anderson, presented a comparison of the Dallas MDA standard, the Texas standard, the national standard and adjusted versions of the latter two. *See* Texas Dep't of Transp., *Jupiter Chevrolet-Geo, Inc. v. Young Chevrolet*, Docket No. 93-130, 1, 17 (Motor Vehicle Bd. Aug. 15, 1994) (final order). In the instant case, Anderson considered and compared two different standards, the national standard and Texas average standard. After considering both standards,

15

Anderson selected the TAA standard, which is the Texas average standard "adjusted for local Houston area consumer preferences."

We disagree that GM/Munday should have been able to rely on the Board's use of the TAA standard alone. GM/Munday knew from previous decisions that the Board's choice of standard was varied, and its own expert's report and testimony show that it prepared its case accordingly. Additionally, because GM/Munday and Landmark exchanged expert reports and exhibits and deposed each other's experts prior to trial, GM/Munday had notice that Landmark would attack the TAA standard and propose a different standard to the Board. As a result, GM/Munday's contention that, "without notice, the Board suddenly decided that the standard was flawed" has no merit.

Furthermore, the Board did not determine that the TAA standard was flawed in all cases. It determined, based on the evidence presented at the hearing, that Landmark's standard was more appropriate to calculate adequacy of representation on the facts of this case.

The Board described Landmark's attack on Anderson's methodology as "scathing," and recounted an "all-out war over the appropriate method by which to gauge adequacy of representation." Although the Board had accepted Anderson's methodology before, on different evidence from a different market, *see* Texas Dep't of Transp., *North Arlington Auto. Co., d/b/a Performance Chevrolet, v. Graff Chevrolet Co. and General Motors Corp.,* Docket No. 97-777, 1, 15 (Motor Vehicle Bd. Sept. 9, 1999) (final order), it noted that "the evidence and argument offered by Landmark and highlighting significant problems with Mr. Anderson's methodology [had not been] readily apparent . . . in past cases before the Board." The Board added that, in this case, Landmark had brought forth a plausible alternative to Anderson's standard.

16

Landmark attacked the applicability of the TAA standard to the Houston market as it existed in 1993 by proving that it was fundamentally dissimilar to the vast majority of the markets used in creating the TAA standard. Landmark, through its expert, Dr. Manuel, adduced evidence that 249 of the 259 Chevrolet markets in Texas used by Anderson to calculate Chevrolet's expected market penetration were single dealer areas (SDAs), while only ten were MDAs. The Board found that Chevrolet dealers in SDAs have a "big advantage" over Chevrolet dealers in MDAs because they are not required to compete within their areas of primary responsibility with other Chevrolet dealers and do not have the same level of competition from interbrand competitors. As a result, the Board found that the expected penetration rate for Chevrolet dealers in SDAs are, "as a rule, higher than those of Chevrolet dealers in fiercely competitive MDAs." The Board concluded that it could not "endorse a process that characterizes a market as 'underperforming' simply because it fails to meet a standard so profoundly influenced by markets bearing so little resemblance to the market in question."

Landmark further attacked the TAA standard by targeting Anderson's "segmentation analysis," by which he adjusted the Texas average to account for differences in consumer preferences and product mix from market to market. Landmark disputed that segmentation was capable of refining the TAA standard to account for the profound differences between MDAs and SDAs. In addition to the evidence already discussed, Landmark adduced evidence that people who live in MDAs have a preference for imported automobiles, showing that manufacturers of Asian automobiles alone made 40% of all retail sales in the Houston MDA in 1992. Landmark argued that the TAA was further skewed by the fact that it is dominated by markets where imports are not readily available, showing that 61% of the import dealerships in Texas are located in the 10 MDAs.

17

Additionally, Landmark adduced testimony that product preference contributes to the higher Chevrolet penetration in SDAs, specifically because of the popularity of trucks in SDAs and Chevrolet's relative strength in that market. Landmark also adduced testimony showing an inverse relationship between high household income and propensity to buy a Chevrolet, and showed that household income in SDAs was 40% lower than in MDAs. In light of this evidence, the Board agreed that Anderson's segmentation analysis did not "sufficiently account for all measurable differences."

Despite Landmark's "scathing" attack on the TAA standard and Anderson's methodology, the Board recounted "a refusal by GM to address, head-on, any shortcomings in the Texas standard that motivated Landmark to offer an alternative standard in the first place." Additionally, by not providing any evidence based on the Texas MDA standard, GM/Munday took the calculated risk that if the Board accepted that standard, it would be left with no evidence. The Board's order noted that "Munday and GM have given the ALJ precious little reason to reject the Texas MDA standard out of hand."

In sum, the Board did not find the TAA standard to be per se unreasonable. Instead, based on the evidence presented and the facts of this case, the Board found that the record did not support a finding that the TAA standard was "a useful tool for accurately gauging Chevrolet's performance in the Houston MDA." Further, the Board found the Texas MDA standard to be appropriate because it did not "unfairly raise the expected average for the Houston MDA by including in its calculation the routinely higher expected averages enjoyed by SDA markets," and conservative because "it included in its calculation markets that are both adequately and inadequately

18

represented." We find that the Board's use of the Texas MDA standard was supported by the evidence and within the Board's discretion.

The Board found that a comparison of Chevrolet's performance in the Houston MDA to *any* of the standards, including the TAA proposed by GM/Munday, "failed to confirm a sufficient amount of shortfall to justify a finding in respondent's favor on the issue of adequacy of representation." As the Board noted, even using the TAA standard, the registration shortfall in the entire Houston MDA in 1992 was only 1,173 units, a figure that decreased even further to 549 units in 1993. These figures were far below the 1,200 to 1,500-unit break-even point and the 2,296-unit planned potential for the proposed Munday dealership.

GM/Munday respond that the Board's numbers are inaccurate because it failed to properly consider gross loss and insell. However, the Board dismissed GM/Munday's gross loss figure, determined by GM/Munday by adding together the shortfall in each census track that did not meet the expected penetration based on the TAA standard, because of its reliance on the flawed TAA standard. The Board dismissed GM/Munday's insell figure, which is the number of units registered in the Houston MDA that were sold by Chevrolet dealers outside of the Houston MDA, because it did not adequately consider the marketing advantages enjoyed by dealers on the geographical fringes of the Houston market. The Board found that there was insufficient evidence in the record to support a finding that Munday was capable of capturing insell from fringe dealers, who have been able to successfully communicate to Houstonians that they sell their products at lower prices than their MDA competitors.

The Board found that GM/Munday's calculation of gross loss and insell were further skewed because GM/Munday relied on figures from the entire MDA, without regard to the amount

19

of gross loss or insell available to Munday within a twenty-mile radius from its location, a distance beyond which a dealer's chance of contributing to its brand's market share was considered remote by the Board. The Board noted that GM/Munday failed to provide enough information to properly calculate gross loss or insell based on a more reasonable standard and distance.

### *Due Process and Equal Protection*

As part of its fourth issue, GM/Munday contend that its equal protection and due process rights were violated when the Board deviated from prior announced standards without notice. *See* U.S. Const. amend. XIV, § 1 (equal protection, due process); Tex. Const. art. I, §§ 3, 19 (equal protection, due process). Specifically, GM/Munday contend that the Board acted in an arbitrary and capricious manner when the Board rejected GM/Munday's use of the TAA standard, and the data derived therefrom, and applied a different and new standard "after the hearing" and without explanation.

In administrative proceedings, due process requires that parties be accorded a full and fair hearing on disputed fact issues. *Office of Pub. Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555, 576 (Tex. App.—Austin 2006, pet. filed). At a minimum, it requires that the "rudiments of fair play" be observed. *Id.*; *State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984). Although the strict rules applicable to courts do not apply to agencies, agencies cannot be arbitrary or inherently unfair. *Office of Pub. Util. Counsel*, 185 S.W.3d at 576. Furthermore, a licensing authority acts arbitrarily and unlawfully if it treats similarly situated applicants differently without an articulated justification. *BMW of N. Am. v. Motor Vehicle Bd.*, 115 S.W.3d 722, 726 (Tex. App.—Austin 2003, pet. denied).

20

As previously discussed, the Board applied established standards in this case and did not create new rules or policies after the hearing. Because GM/Munday were given notice during pre-trial discovery of the standards Landmark would employ to measure harm and adequacy of representation, there was no surprise to GM/Munday or lack of opportunity to introduce contravening evidence. Furthermore, the Board fully explained its decisions regarding adequacy of representation and harm and did not act in an arbitrary or capricious manner.

The cases cited by GM/Munday do not hold otherwise. GM/Munday cite *Flores v. Employers Retirement System of Texas*, 74 S.W.3d 532, 533-34 (Tex. App.—Austin 2003, pet. denied), and *Madden v. Texas Board of Chiropractic Examiners,* 663 S.W.2d 622, 627 (Tex. App.—Austin 1983, writ ref'd n.r.e.), cases in which this Court determined that it was improper for an agency to retroactively apply a newly created rule or policy.

In *Flores* we stated, "an agency is not bound to follow its decisions in contested cases in the same way that a court is bound by precedent." *Flores,* 74 S.W.3d at 544. We added, however, that an agency is required by courts to "explain its reasoning when it 'appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations.'" *Id.* at 544-45. After acknowledging that it had previously accepted Anderson's methodology on adequacy of representation, the Board explained why it was trumped in the instant case by the evidence and argument offered by Landmark, which did not inflate the expectations for the Houston market. Regarding harm, the Board acknowledged its prior decisions and distinguished the instant case, finding that GM/Munday failed to provide sufficient evidence of lost opportunity beyond that which was already being captured by the existing dealer body.

21

It necessarily follows and we hold that the Board did not create a new policy or rule. The Board determined, based on the evidence presented during the hearing process, that Landmark had the more convincing experts and more appropriate methodology to evaluate the statutory good cause factors for the Houston market during the time in question.

GM/Munday also cite *Starr County v. Starr Industrial Services, Inc.*, in which this Court determined that it was arbitrary and capricious for an agency to consider, after the hearing, a factor outside the statutory criteria. 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin 1977, writ ref'd n.r.e.). But in the instant case, the Board did not add any new criteria to the statutory good cause factors.

Accordingly, we overrule GM/Munday's fourth issue.

## CONCLUSION

Because we find that the Board did not act in an arbitrary or capricious manner and its order is supported by substantial evidence, we affirm the Board's order.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: June 9, 2006

22