# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

—————————
## NO. 03-07-00032-CV
—————————

**Texas Logos, L.P., Appellant**

**v.**

**Gregory R. Brinkmeyer, Individually; Hori-Zone Concepts, L.L.C.;
Centerline Supply, Inc.; Lonestar Logos & Signs, L.L.C.; Media Choice, L.L.C.; and
Quorum Media Group, L.L.C., Appellees**

—————————
**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 06-1022-C277, HONORABLE J. F. CLAWSON JR., JUDGE PRESIDING**
—————————


## O P I N I O N


Since the Texas Department of Transportation awarded its "logo sign contract"[1] to

a rival vendor, the vendor that had previously held the contract, Texas Logos, L.P., has filed

two separate lawsuits alleging that a TxDOT engineer involved in the procurement, in combination

with the winning vendor and others, had unlawfully skewed the procurement process so as to cause

Texas Logos to lose the contract. In its first suit, Texas Logos sued TxDOT in Travis County district

court seeking declaratory relief aimed ultimately at voiding the logo sign contract. The district court

dismissed the suit against TxDOT for lack of subject-matter jurisdiction. We affirmed, holding

principally that Texas Logos's declaratory claims seeking to invalidate an already executed contract

---

[1] *See generally Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 108-09
(Tex. App.—Austin 2007, no pet.) (*Texas Logos I*) (describing TxDOT's logo sign program).

with the State were barred by sovereign immunity. *See Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 115-23 (Tex. App.—Austin 2007, no pet.) (*Texas Logos I*).

This appeal relates to Texas Logos's second suit. After it filed its first suit, Texas Logos brought an action in Williamson County against: (1) the now-former TxDOT engineer, Gregory Brinkmeyer; (2) a consulting company that Brinkmeyer had formed, Hori-Zone Concepts, L.L.C.; (3) the vendor that won the logo sign contract, Media Choice, L.LC., and its affiliates, (4) Quorum Media Group, L.L.C. and (5) LoneStar Logos & Signs, L.L.C. (collectively, the Media Choice Defendants); and (6) Centerline Supply, Inc., a subcontractor who allegedly did business with both Brinkmeyer and the Media Choice Defendants. Texas Logos asserted common-law tort theories against the defendants and sought monetary damages and injunctive relief. The district court dismissed the suit for want of subject-matter jurisdiction. Because we conclude that the Williamson County district court possessed subject-matter jurisdiction over Texas Logos's common-law tort damage claims against private parties, we reverse its judgment dismissing those claims and remand for further proceedings.

## STANDARD AND SCOPE OF REVIEW

The subject-matter jurisdiction of a trial court may be challenged through a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Hendee v. Dewhurst*, 228 S.W.3d 354, 366 (Tex. App.—Austin 2007, pet. denied). The determination of whether a trial court has subject-matter jurisdiction begins with the pleadings. *See Miranda*, 133 S.W.3d at 226. The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's

2

jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the pleader has met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.*

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226-27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.* at 227.

When a plea to the jurisdiction challenges the existence of facts alleged by the pleader to establish the trial court's subject-matter jurisdiction, the trial court must consider relevant evidence submitted by the parties. *Id.* at 227 (citing *Bland*, 34 S.W.3d at 555); *Hendee*, 228 S.W.3d at 366. Here, two pleas to the jurisdiction were filed by four of the six defendants. Neither plea challenged the jurisdictional facts alleged by Texas Logos or attached controverting jurisdictional evidence. Nor did any defendant introduce jurisdictional evidence at any hearings relating to the pleas. Consequently, we assume the truth of the factual allegations contained in Texas Logos's pleadings. *Miranda*, 133 S.W.3d at 226. The defendants' jurisdictional challenges, in other words, are limited to disputing whether Texas Logos has pled facts that, if proven, would affirmatively establish the district court's subject-matter jurisdiction.

On the other hand, because Texas Logos attached jurisdictional evidence to its petition, we may consider such evidence in resolving any jurisdictional challenges the defendants have raised. *Bland*, 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required

to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

## THE LOGO SIGN PROCUREMENT STATUTES

Before turning to Texas Logos's pleadings and jurisdictional evidence, it is helpful to note some relevant features of the statutes governing TxDOT's logo sign procurement process.[2] The legislature has charged TxDOT with contracting with third-party vendors to erect and maintain "specific information logo signs," "major shopping area guide signs" and "tourist-oriented directional signs." Tex. Transp. Code Ann. §§ 391.091(a), .0935(f), .099(d) (West 2007 & Supp. 2007). The legislature has prescribed certain terms that such contracts must contain, including provisions for the charging of fees and remittance of at least ten percent to TxDOT. *Id.* §§ 391.091(b), .0935(g), .099(e). It had also specified that, at least with regard to specific-information logo signs and major shopping area guide signs:

> (b) The department may enter into a contract under this section by the method that the department determines is the most advantageous for the state, including competitive bids, competitive sealed proposals, and open market contracts.
>
> . . . .
>
> (c) The department shall make a written award of a contract to the offeror whose proposal offers the best value for the state. In determining the best value for the state, the department may consider:

---

[2] We discussed these statutes in *Texas Logos I*. *See generally Texas Logos I*, 241 S.W.3d at 108-09, 110-11, 116-19.

4

(1)     revenue provided to the department by the contractor;

(2)     fees to be charged eligible businesses or agricultural interests for inclusion on the signs;

(3)     the quality of services offered;

(4)     the contractor's financial resources and ability to perform; and

(5)     any other factor the department considers relevant.

(d)     To the extent of any conflict, this section prevails over any other law relating to the method of the purchasing of goods and services by the department.

(e)     Subtitle D, Title 10, Government Code, and Chapter 223 [the Purchasing Act] do not apply to purchases of goods and services under this section.

*Id.* §§ 391.091(b), (c)-(e); *cf. Texas Logos I*, 241 S.W.3d at 116-19 (discussing parties' dispute over whether the Purchasing Act, instead of the above standards, governed TxDOT's procurement of the third category of logo signs, the tourist-oriented directional signs).

As we observed in *Texas Logos I*, the legislature "has not specifically provided a judicial review mechanism under the Purchasing Act or the transportation code" for challenging TxDOT's logo sign contract award. 241 S.W.3d at 116. Consequently, the judiciary lacks subject-matter jurisdiction to invalidate the award once it has been made. *See, e.g.*, *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 172 (Tex. 2004) ("In Texas, a person may obtain judicial review of an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right."); *Texas Logos I*, 241 S.W.3d at 116 (observing that Texas Logos conceded that it "possessed no vested property right in the award of the logo sign contract that

5

could support a claim to an inherent right of judicial review"); *see also id.* at 119-23 (holding that sovereign immunity barred Texas Logos's declaratory claims seeking to void the logo sign contract).

## THE RECORD

**Pleadings and jurisdictional evidence[3]**

In its live petition, Texas Logos pled that after TxDOT issued a request for proposals (RFP) for the logo sign contract in December 2005, Texas Logos "timely submitted a complete, responsive proposal" that "met or exceeded all the published requirements of the RFP." "[S]everal other companies" also submitted proposals, "including Media Choice and Quorum Media who submitted a joint proposal." After TxDOT scored the submitted proposals, Texas Logos alleged, it initially received the highest score, 98, while Media Choice tied for second with Corey Media, achieving a score of only 93. These top three scorers were then invited to give oral presentations to TxDOT regarding their proposals, which they did in March 2006. On May 12, 2006, TxDOT awarded the logo sign contract to Media Choice. Texas Logos alleges that the final ranking respective scores were Media Choice (79), Texas Logos (77), and Corey Media (70).

Texas Logos attributes what it characterizes as its narrow loss to Media Choice to the tortious acts of the defendants. Specifically, it alleges that "[p]rior to, or during, the procurement process, Media Choice, Quorum Media, Greg Brinkmeyer and . . . others at TxDOT acting in concert with him or Media Choice entered a conspiracy to ensure that Media Choice/Quorum Media received

---

[3] Because we are required here to assume the truth of the factual allegations contained in Texas Logos's pleadings, *Miranda*, 133 S.W.3d at 226, we intend no comment regarding the validity or accuracy of the pled facts we summarize below, as that issue is not before us.

6

the Logo Sign Contract and, thereby, depriving TEXAS LOGOS its right to participate in a fair procurement free from conflicts of interest, cronyism, and fraud." This goal was advanced, Texas Logos alleged, primarily through Brinkmeyer, "who directly managed the Logo Sign Program for TxDOT for several years prior to and during the most recent solicitation and proposal process," "actively participated in the design and development of the RFP, the criteria under which proposals would be evaluated by TxDOT, and the awarding of the Logo Sign Contract,"and served as a member of TxDOT's six-member Logo Sign Evaluation Committee. In return, Texas Logos alleged, Media Choice and/or Centerline Supply agreed to provide work for Brinkmeyer and a consulting business he had recently formed, Hori-Zone. Texas Logos alleged:

- "[A]t some time during or before the Logo Sign Program bid solicitation and proposal process, Defendant Brinkmeyer decided to resign his position at TxDOT and actively sought employment in the private sector" and, before "leaving his position . . . formed Hori-Zone, a privately-owned company whose expressed purpose was to 'help manufacturers . . .develop new products, help gain state approvals . . . developing specification in the state format for inclusion into projects.'"

- "Prior to the RFP for the Logo Sign Contract, Brinkmeyer informed TEXAS LOGOS about employment opportunities he had pursued with another prospective contractor with the State, which TEXAS LOGOS suspected was a veiled inquiry regarding employment by Brinkmeyer. . . . Believing such discussions to be a prelude to an improper and unethical request by Brinkmeyer for employment, TEXAS LOGOS declined to engage in any such discussions with Brinkmeyer."

- "Upon information and belief, Defendant Brinkmeyer approached or was approached by Defendants Media Choice, LoneStar [the successor to Media Choice and Quorum Media], and/or Defendant Centerline Supply regarding employment opportunities after his departure from TxDOT."

- "Thereafter, upon information and belief, Defendants Brinkmeyer, Media Choice, LoneStar, and/or Centerline Supply agreed that in return for Brinkmeyer's assistance in obtaining the Logo Sign Contract for Media Choice and/or providing other consideration, Media Choice and/or Centerline Supply would provide work for Brinkmeyer after he left TxDOT. Based on this or other agreements or understandings, Centerline entered the conspiracy alleged herein."

7

- "Defendant Centerline Supply was recommended by Brinkmeyer to LoneStar as a subcontractor. Centerline entered into an agreement with LoneStar to provide products and/or services to LoneStar and to TxDOT."

- "While still employed at TxDOT, Brinkmeyer used his Department email account to solict business from existing Department clients for himself and his new company, Hori-Zone. Brinkmeyer solicited a consulting position from Centerline Supply while at the same time granting Centerline a specification variance for a fiberglass sign that was Centerline's proprietary technology and from which Centerline stood to gain a substantial financial benefit in the form of direct sales to TxDOT. . . . While still employed at TxDOT, during Department hours and using Department equipment, Defendant Brinkmeyer performed consulting work on Centerline Supply's behalf."

Texas Logos pled that in furtherance of this conspiracy, Brinkmeyer or others at TxDOT acting in concert with him undertook numerous acts to skew the logo sign procurement process to Media Choice's benefit and Texas Logos's detriment, including:

- "During the procurement, and in furtherance of the conspiracy, Brinkmeyer and/or others at TxDOT, acting in concert with him or Media Choice, waived the requirement that Media Choice/Quorum Media submit audited financial statements in response to the RFP. Media Choice then submitted false and misleading unaudited financial statements." In support of these allegations, Texas Logos attached the affidavit of Media Choice's chief financial officer at the time the company submitted its proposal to TxDOT. She testified that the financial statement the company submitted with its proposal was "materially inaccurate" in several respects.

- Brinkmeyer deleted emails and other documents from his computer in violation of the government code. Texas Logos pled "[o]n information and belief, when ultimately discovered, these deleted emails and documents will further evidence Brinkmeyer's collusive efforts with Defendants Media Choice, Quorum Media, LoneStar and/or Centerline Supply . . . ."

- Defendant Brinkmeyer or others at TxDOT acting, in concert with Brinkmeyer or Media Choice/Quorum Media were in contact with certain Media Choice/Quorum Media employees during the bid solicitation and proposal process and provided Media Choice/Quorum Media with material information regarding TEXAS LOGOS' proposal. Texas Logos attached an affidavit from a former Media Choice employee to the effect that Media Choice personnel had a phone conversation with some unidentified TxDOT employee immediately following Texas Logos's oral presentation in the RFP process and that "Media Choice looked pretty good compared to Texas Logos."

8

- "Through the acts and omissions of Defendant Brinkmeyer and/or those at TxDOT acting in concert with him or Media Choice/Quorum Media, the procurement was materially flawed because TxDOT":

  ♦ "used demonstrably inaccurate criteria in evaluating the fees receivable under the proposals submitted by TEXAS LOGOS and Media Choice/Quorum Media."

  ♦ "accepted – in direct violation of its own rules – Media Choice/Quorum Media's proposal despite Media Choice/Quorum Media's non-compliance with the RFP's expressed requirements. . . ."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media with incomplete information regarding the 'value' Media Choice/Quorum Media was providing on the contract. . . ."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media over TEXAS LOGOS despite substantially unfavorable differences between the prospective revenues generated for the State of Texas and retained by [the vendors] during the Contract term."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media over TEXAS LOGOS despite the fact that TEXAS LOGOS' proposed return to TxDOT is higher throughout the contract term than the amounts specified in the contract awarded to Media Choice/Quorum Media . . . ."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media over TEXAS LOGOS despite the fact TEXAS LOGOS offered . . . to provide to the State a [higher] guaranteed minimum annual return. . . ."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media despite the fact that Media Choice/Quorum Media failed to offer the minimum required percentage of fees to the State of Texas . . . ."

  ♦ "awarded a 'best value' procurement contract to Media Choice/Quorum Media despite the fact that Media Choice failed to provide audited financial statements . . . ."

  ♦ awarded a 'best value' procurement contract to Media Choice/Quorum Media over TEXAS LOGOS despite the fact TEXAS LOGOS offered lower costs to certain businesses participating in the logo sign program . . . . "

9

- "Media Choice/Quorum Media knew or should have known that certain above-referenced information supplied to TxDOT in support of its proposal was false or misleading and material to TxDOT's evaluation of its proposal, and that TxDOT would rely upon this information in making its decision to award the contract."

- "Defendant Brinkmeyer knew or should have known that certain information provided by Media Choice/Quorum Media in support of its proposal, or omitted from its bid proposal, was false or misleading and material to the Evaluation Committee's and TxDOT's decision in awarding the Contract. . . . Brinkmeyer and/or others at TxDOT acting in concert with him and/or Media Choice/Quorum Media used his influence within TxDOT and as a member of the Evaluation Committee to push through Media Choice/Quorum Media's incomplete and deficient proposal . . . to ensure that Media Choice/Quorum Media was awarded the Logo Sign Contract."

- "Defendants' acts as alleged allowed Media Choice/Quorum Media to unlawfully participate in the Logo Sign Contract procurement and deprived TEXAS LOGOS of the opportunity to have its proposal evaluated objectively and in compliance with the competitive, best value procurement required by statute."

Based on these factual allegations, Texas Logos asserted claims for actual and exemplary damages under theories of fraud (against Brinkmeyer), civil conspiracy (against all defendants), and tortious interference with a business relationship (against all defendants). It also asserted a claim for declaratory judgments that the defendants had committed these torts.[4] Texas Logos also sought injunctive relief to stay the Media Choice Defendants' performance of the logo sign contract—scheduled to begin on January 1, 2007—until conclusion of the trial on the merits, plus an injunction against "any further destruction of records or evidence relevant to the claims herein."

---

[4] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West Supp. 2007). Texas Logos also sought attorney's fees. *Id*. § 37.009 (West 1997).

10

**Proceedings below**

Texas Logos filed this suit, accompanied by a motion for expedited discovery, on December 11, 2006. A hearing was set on Texas Logos's request for temporary injunction for December 18, 2006. That morning, the Media Choice Defendants filed a plea to the jurisdiction urging that "this case must be dismissed" because (1) Texas Logos's suit sought "judicial review" of TxDOT's logo sign contract award, and the legislature had not provided for such review; and (2) TxDOT was an indispensable party who could not be joined. The injunction hearing was postponed a day for reassignment. On the following morning, prior to the hearing, Brinkmeyer filed a plea to the jurisdiction asserting that he was acting within his official capacity and was shielded by official immunity.

At the injunction hearing, the parties agreed to take up the jurisdictional issues before addressing Texas Logos's request for injunctive relief. None of the parties introduced jurisdictional evidence. Argument was focused on Texas Logos's request for injunctive relief, which the Media Choice Defendants characterized as an attempt to "shut the [logo sign] program down."[5] Brinkmeyer

---

[5] The following exchange occurred in regard to the nature of Texas Logos's claims:

The Court:   When I asked the question what he wants the Court to do, he didn't say anything about interrupting the trans[action], he just wanted to make sure that you didn't make any profit. Isn't that what he said?

Counsel for the Media Choice Defendants:   Your Honor, I'm not sure that's exactly what he said. What their pleadings say –

The Court:   Enjoin you from profiting off of this fraudulent activity.

11

"adopt[ed] Media Choice's argument on jurisdiction also," but briefly argued his grounds. At the conclusion of the hearing, the district court signed an order granting the Media Choice Defendants' plea to the jurisdiction. Although the order otherwise referenced only the plea to the jurisdiction filed by the Media Choice Defendants,[6] its concluding sentence stated, "IT IS ORDERED Defendants' Plea to the Jurisdiction is GRANTED and *this matter* is dismissed for lack of subject-matter jurisdiction." (Emphasis added.)

Disputes soon arose regarding the scope of the dismissal order, and Texas Logos filed a "motion to clarify" the ruling. Texas Logos urged that the Media Choice Defendants had sought dismissal only of Texas Logos's injunctive and declaratory claims, not its tort damages claims, and that the order had not, and could not have, dismissed its claims against the other defendants. Texas Logos asked the district court "to confirm that it grants only the relief sought by [the Media Choice Defendants'] Plea to the Jurisdiction and only as to the moving parties."

---

Counsel:   Well, I think what their pleadings say and I believe what they're requesting in their pleading is the Court enjoin us from taking any steps to perform under this contract, not to profit under the contract. Now, if there was jurisdiction, we could fashion a remedy that would be satisfactory that would say well you know, if we profit from it, that's an adequate remedy of law. There are damages and it's their right at the end of the day and we caused them some damage, a check can be written and that's the end of the story. That doesn't require injunctive relief. But that's not what they're asking for, Your Honor, and I need to be clear on that. What they want to do is they want to shut this program down. They don't want us to perform on it and they don't want Tex DOT to allow us to perform. . . .

[6] The order was titled, "Order Granting Defendants LoneStar Logos & Signs, LLC, MediaChoice, LLC. and Quorum Media Group, LLC's Plea to the Jurisdiction."

12

The district court denied this motion. Texas Logos appeals from the district court's orders dismissing "this matter" and denying its motion to clarify.

## ANALYSIS

Texas Logos brings three issues on appeal, arguing that the district court erred in (1) granting the Media Choice Defendants' plea to the jurisdiction; (2) dismissing its claims against Brinkmeyer; and (3) dismissing claims that it contends were not addressed in the Media Choice Defendants' plea to the jurisdiction and granting relief as to defendants who did not file pleas to the jurisdiction.

### Media Choice Defendants

At this juncture, Texas Logos "does not challenge the Court's decision that TxDOT was indispensable to its claims for *injunctive and declaratory relief*," but limits its complaint to the district court's dismissal of its common-law tort causes of action for monetary damages. These claims, Texas Logos urges, do not seek "judicial review" of or seek to disturb TxDOT's logo sign contract award to Media Choice, but to enforce long-established common-law rights against private parties over which the district courts continue to possess subject-matter jurisdiction. Similarly, Texas Logos argues that TxDOT is not an indispensable party to these claims.

The Media Choice Defendants respond that Texas Logos's tort claims ultimately require re-determination of which bidder's proposal offered "the best value for the state," "whether TxDOT's procurement decision was correct or not," and the validity of that award. In their view, "[s]eeking a ruling that the TxDOT procurement process was tainted by fraud, conspiracy, and

13

tortious acts is nothing more than a backdoor means of attacking the validity of the Logo Sign procurement in an attempt to circumvent the fact that the court lacks jurisdiction to review TxDOT's procurement decisions."

Texas Logos replies that its tort damages claims do not require re-litigation of whether its logo sign contract proposal provided "the best value to the state," but instead "would merely require a jury to decide whether, in the absence of Appellee's . . . conduct, it is *probable* that Texas Logos would have received the Logo Sign Contract." Even if these determinations overlap somewhat, Texas Logos adds, there is nothing in the statutory scheme governing TxDOT's logo sign procurement that manifests legislative intent to divest Texas courts of their subject-matter jurisdiction to adjudicate such issues even when they arise in the context of common-law tort claims. We agree with Texas Logos.

We begin by observing that, at least at this juncture, Texas Logos does not seek to set aside or declare invalid TxDOT's award of the logo sign contract to Media Choice. To the contrary, its tort claims are predicated on the fact that TxDOT has made that award. Similarly, Texas Logos seeks no relief from TxDOT, only from private parties. Nor does Texas Logos now seek to enjoin the performance of the logo sign contract, but requests only monetary damages.

Although some of Texas Logos's factual allegations are capable of being construed as attacks on TxDOT's procurement decision, Texas Logos's common-law tort theories ultimately do not require "review" or re-litigation of the same issues TxDOT decided when awarding the logo sign contract or the correctness of its award. By statute, TxDOT was required to award the logo sign contract based on its determination of which proposal presented "the best value for the state,"

14

considering several enumerated factors. *See* Tex. Transp. Code Ann. § 391.091(c). What Texas

Logos must prove to recover damages resulting from the loss of the logo sign contract is not that its

proposal provided the best value for the state, *per se*, or that TxDOT's determination was "wrong"

based on the information it was provided, but that Texas Logos probably would have won the

contract but for the defendants' tortious conduct.[7] In these respects, Texas Logos is in a position

similar to legal-malpractice plaintiffs, who must prove what the outcome at the tribunal probably

would have been absent tortious conduct, not that the tribunal's decision was wrong on the record

before it. *See Alexander v. Turtur & Assocs*., 146 S.W.3d 113, 118 (Tex. 2004) (in legal malpractice

case, jury was charged with deciding whether, in reasonable probability, a bankruptcy judge would

have decided the underlying adversary proceeding differently, absent the alleged malpractice). Such

an inquiry is not considered a "review" of the tribunal's decision.

Even if there is some overlap between the issues raised by Texas Logos's tort

damages claims and those TxDOT decided when awarding the logo sign contract, we cannot

conclude that the legislature intended to divest the district court of its subject-matter jurisdiction over

---

[7] Based on the pleadings, the principal component of Texas Logos's alleged damages is the loss of the logo sign contract. Similarly, Texas Logos pled, in regard to its tortious interference cause of action," that "But for the Defendants' afore-mentioned tortious and illegal actions, a reasonable probability existed that TxDOT would have awarded the Logo Sign Contract to Plaintiff TEXAS LOGOS and TEXAS LOGOS would have entered into that Contract," and "Defendants' independently tortious or unlawful acts were a direct and proximate cause in preventing TxDOT and Plaintiff TEXAS LOGOS from entering into the afore-mentioned contractual relationship." *See Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc*., 219 S.W.3d 563, 590 (Tex. App.—Austin 2007, pet. denied) (to prove tortious interference with prospective contract plaintiff must establish, among other things, "a reasonable probability that the parties would have entered into a business relationship . . . and actual harm or damages suffered by the plaintiff as a result of the defendant's interference, i.e., that the defendant's actions prevented the relationship from occurring).

those claims. As the Media Choice Defendants acknowledged during oral argument, their contentions that Texas Logos's common-law tort claims seek "judicial review" of TxDOT's procurement decision ultimately amounts to an assertion that the legislature vested TxDOT with the sole or exclusive jurisdiction to decide those issues—and correspondingly divested the judiciary of its jurisdiction to decide them—even when those issues arise in the context of common-law tort claims. *See Texas Logos I*, 241 S.W.3d at 116-17 (rejecting TxDOT's contention that Texas Logos's declaratory claims sought "judicial review" of its procurement decision; explaining that district court's subject-matter jurisdiction over declaratory claims "exists independently of any administrative remedies," although "the subject matter of a UDJA claim . . . may sometimes be subsumed within the agency's exclusive jurisdiction"). We find no support for that assertion.

Our analytical starting point for determining whether a trial court or an administrative agency has subject-matter jurisdiction over an issue in dispute is article V, section 8 of the Texas Constitution. It provides that a district court's jurisdiction "consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body." Tex. Const. art. V, § 8. The legislature has provided by statute that district courts possess "the jurisdiction provided by Article V, Section 8, of the Texas Constitution," and "may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity." Tex. Gov't Code Ann. §§ 24.007-.008 (West 2004). Thus, "[c]ourts of general jurisdiction

16

presumably have subject matter jurisdiction unless a contrary showing is made." *Subaru of Am., Inc. v. David McDavid Nissan, Inc*., 84 S.W.3d 212, 220 (Tex. 2002).

By contrast, "there is no presumption that administrative agencies are authorized to resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory language, confers upon them." *Id.* "Courts will not imply additional authority to agencies, nor may agencies create for themselves any excess powers." *Id.* The courts are not divested by an agency of the subject-matter jurisdiction they would otherwise possess to adjudicate a dispute unless the legislature has granted the agency exclusive jurisdiction, or the sole power to make the initial determination in the dispute. *Id.* at 221; *Bexar Metro. Water Dist. v. City of Bulverde*, 156 S.W.3d 79, 90 (Tex. App.—Austin 2004, pet. denied). Whether an agency has exclusive jurisdiction is determined by construction of the relevant statutory scheme. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006). Such jurisdiction may be reflected in either express statutory language to that effect or the overall statutory scheme. *Id*. at 340-42.

Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek to discern the legislature's intent, as manifested first and foremost in the statutory text. *Id*. We ascertain the legislature's intent from the plain meaning of the words chosen when possible. *Id*. To that end, we consider statutory language in context, not in isolation. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1988); *see* Tex. Gov't Code Ann. § 311.011(a) (West 2005). We also presume that the legislature acted with knowledge of the background law. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). When ascertaining legislative intent, we may also consider the objective of the law,

its history, and the consequences of a particular construction. Tex. Gov't Code Ann. § 311.011(b); *see also id.* § 311.023(1), (3), (5) (West 2005).

We further observe that the types of claims Texas Logos asserts—causes of action for damages arising from fraud, tortious interference with an existing contract, and civil conspiracy—are deeply rooted in Texas common law. *See Williams v. Khalaf*, 802 S.W.2d 651, 655 (Tex. 1990) (discussing the common law development of fraud in Texas); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 721 (Tex. 2001) (discussing the history and development of tortious interference law in Texas); *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (noting that common law civil conspiracy, has been "long a recognized tort in this state"). Texas courts have also recognized that such claims may arise from a private party's torts while inducing governmental action. *See generally Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926-27 (Tex. 1993) (recognizing existence of tortious-interference claim between competing state contractors); *Texas Disp. Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563 (Tex. App.—Austin 2007, pet. denied) (discussing tort claims asserted by business against its competitor arising from municipal actions induced by competitor's communications); *cf. RRR Farms v. American Horse Prot. Ass'n*, 957 S.W.2d 121, 126-31 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (discussing affirmative defense under the *Noerr-Pennington* doctrine). These considerations inform our analysis of the statutory framework governing TxDOT's logo sign procurement process. Specifically, because statutory repeal or abrogation of common-law claims implicates open-courts concerns, it is "disfavored" and the statute may be so interpreted only when its express terms or

18

necessary implications clearly indicate the legislature's intent to take those actions. *Cash Am. Int'l v. Bennett*, 35 S.W.3d 12, 16 (Tex. 2000); *see* Tex. Const. art. I, § 13.

There is no clear legislative intent in the statutory scheme governing TxDOT's procurement of the logo sign contract to divest Texas courts of their subject-matter jurisdiction over the types of common-law claims Texas Logos asserts. The legislature certainly did not state any such intent. *Cf. Subaru*, 84 S.W.3d at 219, 223 (construing motor vehicle code, which delegated to motor vehicle board "exclusive, original jurisdiction to regulate those aspects of the distribution, sale and leasing of motor vehicles as governed by this Act," to create a "hybrid claims-resolution process" under which code-interpretation issues raised by common-law claims must first be adjudicated by the board). Nor is any such intent implicit in the statutory scheme as a whole. The legislature delegated to TxDOT authority to determine the narrow question of which vendor's logo sign proposal was the best based on statutory criteria. Beyond this, it did not empower TxDOT to regulate the conduct of private vendors, much less supplant the rights and duties those vendors or other private parties owe each other under the common law. *Cf. American Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 803-04 (Tex. 2001) (where legislature has made recovery of workers' compensation benefits the "exclusive remedy" of covered employees and their beneficiaries, plaintiff's tort claim for wrongful deprivation of such benefits required prior agency ruling that worker was entitled to such benefits); *Texas Court Reporters Cert. Bd. v. Esquire Depo. Servs., L.L.C.*, 240 S.W.3d 79, 89-90 (Tex. App.—Austin 2007, no pet.) (discussing certification board's exclusive jurisdiction to make disciplinary determinations within comprehensive statutory scheme to regulate court reporters). And, again, Texas Logos's claims do not seek to invalidate the logo sign

19

contract or obtain any other remedy that the legislature has vested in TxDOT. *Compare Fodge*, 63 S.W.3d at 803-04 (tort claim for wrongful deprivation of workers' compensation benefits implicated decision within the agency's exclusive jurisdiction to award such benefits) *with Texas Mut. Ins. Co. v. Texas Dep't of Ins., Div'n of Workers' Comp.*, 214 S.W.3d 613, 616-21 (Tex. App.—Austin 2006, no pet.) (distinguishing *Fodge* and holding that mere fact that coverage issue presented by common-law claim paralleled potential coverage issues within division's exclusive jurisdiction to determine did not divest district court of its subject-matter jurisdiction over the common-law claim).

This Court's decision in *Austin Chevrolet, Inc. v. Motor Vehicle Board* is also instructive. 212 S.W.3d 425 (Tex. App.—Austin 2006, pet. denied). In 1993, a car dealer filed a license application with the motor vehicle board for a new General Motors dealership. A competing dealer filed a protest. The competitor ultimately withdrew the protest based on what it claims were assurances from GM that it would address the dealer's concerns, and the new dealership went forward. A few years later, additional disputes arose and the protesting dealer filed suit in district court alleging that GM had defrauded it out of its right to protest the 1993 license application, causing it damages related to the dealership's approval. In an attempt to follow the supreme court's directives in *Subaru*, the district court abated the suit and referred to the board the issue of whether the board would have denied the license if the protest had not been withdrawn. *See id.* at 429. While recognizing the board's expansive exclusive jurisdiction to decide code-based issues even when arising in common-law claims, we held that this jurisdiction did not extend to deciding what the board *would have* decided in 1993 if the protesting dealer had not been induced to abandon its

20

protest. *See id.* at 431-32 ("although the Board has expertise and experience in making the good cause determination in protest proceedings and has developed rules and procedures for those proceedings, it has no expertise, experience, or rules relevant to a determination of how Board members sitting in the past would have reasoned or ruled, or in determining what evidence, witnesses, and theories the parties might have proffered in a past proceeding."). We similarly conclude here that whatever authority the legislature delegated to TxDOT to determine the best value for the state in awarding the logo sign contract is not implicated or infringed by Texas Logos's tort damages claims, which turn on what the agency probably *would have* decided absent the defendants' alleged tortious conduct.

The Media Choice Defendants ultimately rely on what they term "sound public policy," urging that "claims for damages against private parties are just as harmful to the finality of the procurement process as its claims for injunctive and declaratory relief" because the prospect of "protracted litigation brought by unsuccessful bidders" would cause "the validity of . . . contract awards [to] remain uncertain" and make "[t]he business of the State . . . grind to a halt." They add that they or potential TxDOT employee-witnesses would be "distracted as a result of litigation from a disgruntled bidder" and "private interests would be less willing to participate i[f] State competitive bidding processes exposed them to civil suits." Whatever merit these policy concerns might have, we have concluded that the legislature has thus far not acted to address them by divesting the Texas judiciary of its subject-matter jurisdiction over the types of common-law damages claims Texas Logos asserts. We also agree with Texas Logos's observations that the jurisdictional limitations the Media Choice Defendants advocate amount to an extension of

21

TxDOT's sovereign immunity to shield its *vendors*, as well as any agency employees who might be witnesses in litigation between private parties. There is no support in Texas law for such an expansive application of sovereign immunity.

In sum, we agree with Texas Logos that the legislature has not divested the district court of its subject-matter jurisdiction to adjudicate Texas Logos's common-law tort claims for damages. We similarly conclude that because Texas Logos no longer seeks any injunctive or declaratory relief, TxDOT is not an indispensable party. *Cf. Texas River Barges v. City of San Antonio*, 21 S.W.3d 347, 357 (Tex. App.—San Antonio 2000, pet. denied) (party to a contract "is an indispensable party to any litigation that *seeks to declare the contract void*") (emphasis added); *McCharen v. Bailey*, 87 S.W.2d 284, 285 (Tex. Civ. App.—Eastland 1935, no writ) ("Where the injunction in effect sets aside a contract all parties to the contract are necessary parties."). We conclude that the district court erred in granting the Media Choice Defendants' plea to the jurisdiction as to Texas Logos's common-law tort claims for damages.

**Other defendants**

Of the remaining defendants, only Brinkmeyer asserts any additional legal theory under which the district court could have dismissed Texas Logos's claims against them for want of subject-matter jurisdiction. Brinkmeyer, as well as Centerline, have merely incorporated or adopted the Media Choice Defendants' jurisdictional arguments,[8] while Brinkmeyer's consulting firm, Hori-Zone, has not filed a brief.

---

[8] Although its brief is otherwise consistent with that of the Media Choice Defendants, Centerline omits the argument that TxDOT is an indispensable party.

Brinkmeyer, as noted, filed a plea to the jurisdiction below, and he brings those grounds for dismissal forward on appeal in support of the district court's dismissal of Texas Logos's claims against him. Brinkmeyer argues that (1) he is shielded by sovereign immunity "because complaints of his actions as a governmental official may be complaints against him in his official capacity, and thus a suit against the State"; and (2) Texas Logos has pled only acts for which he possesses official immunity and "official immunity is immunity from suit, which makes it jurisdictional and analogous to sovereign immunity." At oral argument, Brinkmeyer acknowledged that his notion that the affirmative defense of official immunity is jurisdictional rather than a plea in bar represents an extension of current Texas law on the subject, although one that he urges is "not that much of a stretch." *See City of Lancaster v. Chambers*, 883 S.W.3d 650, 653 (Tex. 1994) ("Government employees are entitled to official immunity from suit . . . ."); *but see Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 843 (Tex. 2007) (observing that section 51.14(a) of the civil practice and remedies code reflects that "an official sued in his individual capacity would assert official immunity as a defense to personal monetary liability, which is well suited for resolution in a motion for summary judgment . . . [b]ut an official sued in his official capacity would assert sovereign immunity."). We need not reach that question, however, because any assertions that Texas Logos has pled only acts shielded by Brinkmeyer's official immunity or within his official capacity are without merit. *See id.* (official immunity applies to acts within a governmental employee's "performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority."); *see also Miranda*, 133 S.W.3d at 226 (we construe pleadings liberally, looking to the pleader's intent, and pled jurisdictional facts are presumed true

23

unless conclusively negated with jurisdictional evidence). Accordingly, the district court would have erred in dismissing Texas Logos's claims against Brinkmeyer on these grounds.

For these reasons, our analysis of the Media Choice Defendants' arguments requires reversal of the district court's order or orders dismissing Texas Logos's monetary damages claims as to all six defendants. As this is the entirety of the relief Texas Logos seeks in this appeal, we need not reach its issue complaining that the district court erred in granting relief beyond the scope of the Media Choice Defendants' plea to the jurisdiction.[9] *See* Tex. R. App. P. 47.1.

## CONCLUSION

We reverse the district court's judgment dismissing Texas Logos's common-law tort damages claims for want of subject-matter jurisdiction, and remand for further proceedings consistent with this opinion.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Reversed and Remanded

Filed:  May 7, 2008

_____

[9] *See Hendee I*, 228 S.W.3d at 375 (acknowledging that while jurisdictional issues generally can be raised *sua sponte* or on appeal, procedural limitations may come into play that render dismissal on sovereign immunity grounds erroneous or an abuse of discretion).

24