# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00415-CV

---

**Subaru of America, Inc., Appellant**

v.

**Board of the Texas Department of Motor Vehicles; Daniel Avitia, in his Official Capacity as Executive Director of the Texas Department of Motor Vehicles; and McAllen Jeep, Inc. d/b/a Bert Ogden Subaru, Appellees**

---

### DIRECT APPEAL FROM THE MOTOR VEHICLE BOARD OF THE TEXAS DEPARTMENT OF MOTOR VEHICLES

---

## M E M O R A N D U M   O P I N I O N

A motor-vehicle distributor, Subaru of America, Inc. (Subaru) sought to terminate its franchise agreement with a motor vehicle dealer, McAllen Jeep, Inc. d/b/a Bert Ogden Subaru (Bert Ogden) under Section 2301.453 of the Occupations Code. *See* Tex. Occ. Code § 2301.453(a). After receiving Subaru's notice of termination, Bert Ogden filed a protest with the Board of the Texas Department of Motor Vehicles (the Board). After an administrative hearing, the Board issued a final order, which concluded that Subaru failed to show good cause for termination and therefore granted Bert Ogden's protest.

On appeal, Subaru contends that the Board prejudiced its substantial rights by (1) concluding that one of seven good-cause factors—injury or benefit to the public—weighs strongly against termination, (2) concluding that another good-cause factor—the adequacy of

Bert Ogden's service facilities, equipment, parts, and personnel—is neutral, and (3) ultimately determining that Subaru failed to show good cause to terminate Bert Ogden's franchise. We will affirm the Board's final order.

## STATUTORY FRAMEWORK

We begin with the applicable statutory framework to provide the legal context for understanding the relevant background facts and procedural history.

Chapter 2301 of the Occupations Code governs various aspects of the motor vehicle industry in Texas, including the relationship between vehicle distributors and vehicle dealers. *See generally* Tex. Occ. Code §§ 2301.001–.853. Section 2301.453 establishes the procedure for a distributor to terminate its franchise with a dealer. *Id.* § 2301.453.CV

Before terminating its franchise, the distributor must provide notice to the dealer, stating the specific grounds for the termination. *Id.* § 2301.453(a), (c). The dealer may then file a protest with the Board. *Id.* § 2301.453(e). If the dealer files a protest, the Board refers the case to the State Office of Administrative Hearings (SOAH) for an evidentiary hearing before an administrative law judge (ALJ). *Id.* §§ 2301.453(f)(2), .703(a), .704(a).

At the evidentiary hearing, the distributor has the burden to show that good cause exists to terminate the franchise. *See id.* § 2301.453(a)(3). To determine whether good cause exists, the ALJ must consider "all existing circumstances," including seven statutorily specified factors:

(1)    the dealer's sales in relation to the sales in the market;

(2)    the dealer's investment and obligations;

(3)    injury or benefit to the public;

2

(4) the adequacy of the dealer's service facilities, equipment, parts, and personnel in relation to those of other dealers of new motor vehicles of the same line-make;

(5) whether warranties are being honored by the dealer;

(6) the parties' compliance with the franchise, except to the extent that the franchise conflicts with this chapter; and

(7) the enforceability of the franchise from a public policy standpoint, including issues of the reasonableness of the franchise's terms, oppression, adhesion, and the parties' relative bargaining power.

*Id.* § 2301.455(a). After the hearing, the ALJ issues a proposal for decision (PFD) supported by proposed

- findings of basic facts, i.e., findings that answer the questions of "who did what, when, how, why, and with what motive or intent,"

- findings of ultimate facts, i.e., findings based on inferences from basic facts and that often involve a determination of a mixed question of law and fact, and

- conclusions of law.

*Hyundai Motor Am. v. New World Car Nissan, Inc.*, 581 S.W.3d 831, 838 (Tex. App.—Austin 2019, no pet.).

The Board then reviews the ALJ's proposed findings and conclusions and makes the ultimate decision of whether good cause exists. Tex. Occ. Code § 2301.453(g). The Board has "exclusive jurisdiction to determine the issue of good cause," including the weight to be given each statutory factor. *Austin Chevrolet, Inc. v. Motor Vehicle Bd. & Motor Vehicle Div. of Tex. Dep't of Transp.*, 212 S.W.3d 425, 432 (Tex. App.—Austin 2006, pet. denied). But in making its decision, the Board's discretion to change the ALJ's findings or conclusions is

circumscribed by the Administrative Procedure Act (APA), which permits the Board to make such a change only if it determines:

> (1)    that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies provided under Subsection (c), or prior administrative decisions;
>
> (2)    that a prior administrative decision on which the administrative law judge relied is incorrect or should be changed; or
>
> (3)    that a technical error in a finding of fact should be changed.

Tex. Gov't Code § 2001.058(e). The APA further requires the Board to "state in writing the specific reason and legal basis" for each change. *Id.*

While the Board may not reweigh the evidence to make new findings of basic fact, it may reweigh the statutory factors to make new findings of ultimate fact and new conclusions of law. *See Hyundai Motor Am.*, 581 S.W.3d at 842 (board may not ignore or make new basic fact findings); *Grubbs Nissan Mid-Cities, Ltd. v. Nissan N. Am., Inc.*, No. 03-06-00357-CV, 2007 WL 1518115, at *4 (Tex. App.—Austin May 23, 2007, pet. denied) (mem. op.) (in good-cause analysis, board determines "the weight to be given each statutory factor"); *Meier Infiniti Co. v. Motor Vehicle Bd.*, 918 S.W.2d 95, 100 (Tex. App.—Austin 1996, writ denied) (in good-cause analysis, board "is responsible for determining which factors to consider" and "how much weight each factor should receive").

Having set forth the statutory framework, we now turn to the facts of the case.

4

# BACKGROUND[1]

## The Parties

Subaru is the authorized distributor of Subaru-brand vehicles and parts for the United States, which it distributes through a network of Subaru dealers. Bert Ogden is a Subaru dealer. Its franchise is governed by a Dealer Agreement with Subaru. Since 2009, Bert Ogden has been the only Subaru dealer in the Rio Grande Valley. Its dealership is in Edinburg, Texas, and shares facilities with two other dealerships in the Bert Ogden Auto Group.

## The Pharr Area of Responsibility

Subaru divides its dealers into geographic areas called Regions, Zones, and Districts. Bert Ogden is in Subaru's Central Region, the DFW Zone, and District 3. The DFW Zone includes forty-four Subaru dealers located in New Mexico, Texas, Louisiana, Mississippi, Tennessee, Arkansas, and Oklahoma. District 3 includes eleven Subaru dealers in Houston, San Antonio, Selma, Nederland, Bryan, and Corpus Christi.

Under the Dealer Agreement, Subaru assigned Bert Ogden a geographic area in District 3 known as the Pharr Area of Responsibility (AOR), which is situated within the Rio Grande Valley. In recent years, the Subaru brand has grown significantly, and so has the population of the Pharr AOR. Both Subaru and Bert Ogden believe the Pharr AOR presents opportunity for new vehicle sales and service business. But the Pharr AOR also poses geographic challenges that other Subaru dealers do not face. The Pharr AOR borders Mexico to the south and west, the Gulf of Mexico to the east, and a thinly populated desert to the north, so

---

[1] Our recitation of the facts is adopted from the PFD unless otherwise indicated.

selling Subarus outside the Pharr AOR is more difficult than selling Subarus outside other AORs.

**Bert Ogden's Sales, Customer Satisfaction, and Operations**

In the years leading up to its proposed termination of Bert Ogden's franchise, Subaru voiced complaints about Bert Ogden's sales, customer satisfaction rankings, and operations.

*Sales*

For years, Bert Ogden had failed to meet its sales performance obligations under the Dealer Agreement and had been the lowest-performing dealer in the DFW Zone. In 2017, Subaru and Bert Ogden executed a Sales Performance Addendum, which gave Bert Ogden three years to meet reduced sales targets. Over the following three years, Bert Ogden sold every new vehicle Subaru allocated to it and increased sales for each successive year. But Bert Ogden failed to meet its reduced sales targets and continued to be the lowest-performing Subaru dealer in the DFW Zone.

*Customer Satisfaction*

During this same period, Bert Ogden ranked at or near the bottom of the DFW Zone in customer satisfaction as measured by Bert Ogden's Owner Loyalty Program (OLP) survey responses. But while Bert Ogden's OLP comparative rankings were low, its actual OLP scores were high, with customers scoring their purchase and service experiences at Bert Ogden as closer to "Extraordinary" than "Very Good" for each year.

6

*Operations*

Subaru's complaints about Bert Ogden's operations during this period focused on perceived deficiencies in its inventory and personnel. Bert Ogden reported having less inventory of parts, accessories, and service equipment per vehicle in operation (VIO) than other similar-sized Subaru dealers. Bert Ogden's parts and service departments had a high level of turnover that was "very uncommon" for Subaru dealers. Unlike other Subaru dealers, Bert Ogden failed to increase the number of service-department employees to keep up with rising demand for vehicle services. And Bert Ogden failed to comply with its obligation under the Dealer Agreement to provide exclusive personnel (personnel who worked only on Subarus) in key positions, such as service manager and parts manager.

**Subaru's Notice of Termination**

Subaru offered Bert Ogden various forms of assistance to improve its sales metrics, customer satisfaction rankings, and perceived operational deficiencies. But Bert Ogden's performance did not improve to Subaru's satisfaction.

In 2020, Subaru sent Bert Ogden a Notice of Termination, *see* Tex. Occ. Code § 2301.453(a), (c), which identified three grounds for termination:

- Bert Ogden's failure to achieve Subaru's minimum sales responsibility (MSR) and the new vehicle-sales numbers under the Sales Performance Addendum,

- Bert Ogden's failure to meet a "comparative" ranking requirement under the Dealer Agreement for customer-satisfaction rankings, and

- other "operational deficiencies."

In response, Bert Ogden acknowledged that it had not achieved the MSR set by Subaru, but it also challenged the MSR's appropriateness and how Subaru had calculated it for

7

the Pharr AOR. Bert Ogden further asserted that Subaru had failed to provide it sufficient inventory to comply with the Sales Addendum. Bert Ogden denied that any customer-satisfaction-ranking requirement existed under the Dealer Agreement.

**The ALJs' Proposal for Decision**

Bert Ogden filed a protest with the Board. *Id.* § 2301.453(e). The Board then referred the case to SOAH for an evidentiary hearing before two ALJs. *Id.* §§ 2301.453(f)(2), .703(a), .704(a).

After the hearing, the ALJs issued a PFD, in which they concluded that Subaru had shown good cause to terminate Bert Ogden's franchise and therefore recommended that Bert Ogden's protest be denied. The ALJs concluded that four of the seven good-cause factors favored termination. *Id.* § 2301.455(a).

The ALJs concluded that the first factor, Bert Ogden's sales in relation to the market, *id.* § 2301.455(a)(1), favored termination based on their finding that Bert Ogden had consistently been the lowest-performing dealer in the DFW Zone.

The ALJs concluded that the third factor, the injury or benefit to the public, *id.* § 2301.455(a)(3), favored termination based on their findings that:

- when ranked against other dealers in the DFW Zone, Bert Ogden placed at or near the bottom in purchase-satisfaction scores from 2017-2021,

- Subaru has indicated that it intends to quickly install a new dealer, so any inconvenience will be brief and is outweighed by the benefit the public will realize once a new dealer is established,

- there is little benefit to the public to continuing Bert Ogden's dealership agreement, considering the dealership's consistently low purchase- and service-satisfaction rankings, and

- the possibility of inconvenience to customers during the transition to a new dealer and the lack of benefit of leaving Bert Ogden's dealership agreement in place is outweighed by the benefit to the public of a new Subaru dealer.

The ALJs concluded that the fourth factor, the adequacy of Bert Ogden's service facilities, equipment, parts, and personnel in relation to other Subaru dealers, *id.* § 2301.455(a)(4), favored termination based on their findings that

- Bert Ogden reported having fewer service parts, accessories, and equipment than other similarly sized Subaru dealers in the DFW Zone,

- Bert Ogden had higher turnover in its parts and service departments than other dealers in District 3,

- Bert Ogden failed to employ Subaru-exclusive personnel in key positions, and

- unlike other Subaru dealers, as VIOs increased, Bert Ogden failed to increase its number of service-department employees and dedicated personnel.

The ALJs concluded that the sixth factor, the parties' compliance with the franchise, *id.* § 2301.455(a)(6), favored termination based on their findings that Bert Ogden breached its sales-performance and personnel obligations under the Dealer Agreement.

The ALJs concluded that the second factor, Bert Ogden's investment and obligations, *id.* § 2301.455(a)(2), was neutral.

The ALJs concluded that the fifth factor, whether Bert Ogden was honoring warranties, *id.* § 2301.455(a)(5), did not favor termination based on their finding that Subaru failed to show that Bert Ogden refuses to perform warranty work, including on older, high-mileage Subaru vehicles covered under warranty extensions or extended service agreements.

9

Regarding the seventh factor, the enforceability of the franchise, *id.* § 2301.455(a)(7), the ALJs found that the Dealer Agreement is enforceable and not an unconscionable contract of adhesion.

**The Board's Final Order**

The PFD was submitted to the Board. After hearing oral argument, the Board issued its Final Order. In its order, the Board adopted the ALJs' proposed findings of basic fact. But on two good-cause factors, the Board drew different inferences from the basic facts than the ALJs, rejected the ALJs' conclusions of law, and adopted new conclusions in their place.

First, the Board rejected the ALJs' conclusion that the third factor—injury or benefit to the public, *see id.* § 2301.455(a)(3)—favored termination, and it adopted a new conclusion that the factor weighs strongly against termination.

In doing so, the Board determined that the ALJs misinterpreted Section 2301.455(a)(3) by relying on Bert Ogden's comparative OLP rankings in evaluating the injury or benefit to the public. The Board explained that, unlike other good-cause factors, Section 2301.455(a)(3) does not require a relative comparison of Bert Ogden to other dealers. The Board further explained that the relatively low OLP rankings do not accurately reflect the quality of sales and vehicle service provided by Bert Ogden to the public and therefore do not support the conclusion that Bert Ogden is injuring the public.

The Board further concluded that Bert Ogden has provided "significant benefits" to the public in the Pharr AOR. The Board based its conclusion on the ALJs' findings that Bert Ogden has been in business since 2009, has adequate facilities, and performs warranty work for Subaru owners in the Pharr AOR, including work on older, high-mileage Subarus.

10

Finally, the Board concluded that Subaru's intention to quickly install a new dealer is "speculative" and therefore "deserves little weight" and that the ALJs misinterpreted Section 2301.455(a)(3) in finding that the injury to the public from terminating Bert Ogden's franchise would be outweighed by the "hypothetical" benefit of a new dealer. The Board therefore further concluded that terminating the franchise would cause "significant harm" to the public because there would no longer be a Subaru dealer in the Rio Grande Valley and residents would have to drive at least 150 miles one way to Corpus Christi or San Antonio to buy a Subaru or to receive warranty or recall work.

Second, the Board rejected the ALJs' conclusion that the fourth factor—the adequacy of Bert Ogden's service facilities, equipment, parts, and personnel in relation to other dealers, Tex. Occ. Code § 2301.455(a)(4)—favored termination, and it adopted a new conclusion that the factor is neutral.

In doing so, that Board determined that the ALJs misinterpreted Section 2301.455(a)(4) in weighing the adequacy of Bert Ogden's facilities against the inadequacy of Bert Ogden's equipment, parts, and personnel. The Board explained that the adequacy of the facilities is "very important to the public's experience of the dealership" whereas the inadequacy of the parts inventory "carries less significance in the context of the modern motor vehicle industry where there is fast shipping and delivery of parts from manufacturers to dealers that allows dealers to get parts as needed."

The Board further determined that the ALJs misinterpreted Section 2301.455(a)(4) "by focusing primarily on exclusive personnel, rather than on the total number of Bert Ogden personnel available to assist and service vehicles for its customers." The Board explained that Section 2301.455(a)(4) does not impose an exclusivity requirement for personnel

11

and that the ALJs' findings of fact show that Bert Ogden had personnel who were shared among its other dealerships, including the two other dealerships that are in the same location as the Subaru dealership. Thus, the Board further explained, while Bert Ogden did not have as many Subaru-exclusive personnel as did other Subaru dealers, that does not show that its personnel were inadequate to meet its customers' needs since shared personnel served Subaru customers. The Board therefore concluded that the inadequacy of Bert Ogden's exclusive personnel is not a significant factor and carries little weight. Based on these new conclusions, the Board determined that this factor was neutral.

In making its ultimate decision, the Board explained that the two good-cause factors most directly impacting the public—the injury or benefit to the public and the honoring of warranties—weighed heavily against termination. The Board further explained that none of the factors weighing in favor of termination "have an immediate impact on the public" or are "significant enough to overcome the importance to the public of the factors that weigh heavily against termination." Thus, the Board determined that Subaru failed to show good cause to terminate Bert Ogden's franchise and therefore granted its protest.

Subaru appeals.

**DISCUSSION**

On appeal, Subaru raises a number of issues, which fall into three broad categories: (1) issues concerning the Board's conclusion that the third good-cause factor—injury or benefit to the public—weighs strongly against termination, (2) issues concerning the Board's conclusion that the fourth good-cause factor—the adequacy of Bert Ogden's service facilities, equipment, parts, and personnel—does not weigh either in favor of or against termination, and

12

(3) issues concerning the Board's ultimate determination that Subaru failed to demonstrate good cause to terminate Bert Ogden's franchise.

**Standard of review**

We review the Board's final order under the substantial-evidence rule. Tex. Occ. Code § 2301.751(a); Tex. Gov't Code § 2001.174. "This is a limited standard of review that gives significant deference to the [Board] in its field of expertise." *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995).

Under this "highly deferential" standard, *Continental Imports, Inc. v. Mercedes-Benz USA, LLC*, No. 03-21-00377-CV, 2023 WL 114876, at *2 (Tex. App.—Austin Jan. 6, 2023, pet. denied) (mem. op.), the issue "is not whether the [Board]'s decision was correct, but whether the record demonstrates some reasonable basis for the [Board]'s action." *Austin Chevrolet, Inc.*, 212 S.W.3d at 431.

We presume that the Board's decision should be affirmed under the substantial-evidence rule. *Id.* at 430. The burden is on Subaru to show that the Board's findings, inferences, conclusions, or decision prejudiced its substantial rights. *Id.*; *see* Tex. Gov't Code § 2001.174(2) (stating grounds for reversal under substantial-evidence rule). As relevant here, the Board's final order prejudices Subaru's substantial rights if:

- it is not reasonably supported by substantial evidence,

- it exceeds its statutory authority because it ignores the ALJs' basic fact findings, reweighs the evidence to make new basic fact findings, and otherwise changes findings of fact or conclusions of law made by the ALJ in a manner inconsistent with the APA, *Hyundai Motor Am.*, 581 S.W.3d at 838, 842; *Flores v. Employees Ret. Sys. of Texas*, 74 S.W.3d 532, 551 (Tex. App.—Austin 2002, pet. denied), or

13

- it is arbitrary and capricious because it fails to adequately explain the Board's reasons for departing from precedent and makes ad hoc policy shifts. *Oncor Elec. Delivery Co. v. Public Util. Comm'n*, 406 S.W.3d 253, 267 (Tex. App.—Austin 2013, no pet.) (agency must "explain its reasoning when it appears to have departed from its earlier administrative policy or to be inconsistent in its determinations"); *Flores*, 74 S.W.3d at 545 (agency acts arbitrarily and capriciously if it "adopts new policy in the course of a contested-case hearing without giving the parties pre-hearing notice").

Tex. Gov't Code § 2001.174(2)(B), (E)–(F).

**Injury or benefit to the public**

We begin by considering Subaru's issues concerning the Board's conclusion that the third factor, the "injury or benefit to the public," Tex. Occ. Code § 2301.455(a)(3), "weighs strongly against termination." In concluding that the third factor weighs strongly against termination, the Board rejected the ALJs' contrary conclusion, determining that it rested on two misinterpretations of law. First, the Board determined that the ALJs erroneously based their conclusion in part on Bert Ogden's comparative customer-satisfaction rankings while ignoring Bert Ogden's actual customer-satisfaction scores. Second, the Board determined that the ALJs erroneously based their conclusion in part on their "speculative" finding that any injury to the public from terminating Bert Ogden would be outweighed by the "hypothetical" benefit of a new dealer. Subaru contends that the ALJs committed neither error and that the Board's corrections are themselves erroneous and prejudice Subaru's substantial rights for various reasons. We consider each correction in turn.

*Comparative rankings*

The Board determined that the ALJs misinterpreted Section 2301.455(a)(3) by assessing injury based on comparative rankings while ignoring Bert Ogden's actual customer-

14

satisfaction scores of "closer to extraordinary than very good." The Board concluded that the ALJs' reliance on comparative customer-satisfaction rankings is unsupported by the language of Section 2301.455(a)(3). In its final order, the Board explained that, when the legislature intends for the Board to compare the performance of different dealers, that requirement is set out explicitly. Thus, the first good-cause factor expressly requires a comparative analysis by stating that the dealer's sales must be considered "***in relation to*** the sales in the market." *Id.* § 2301.455(a)(1) (emphasis added). Likewise, the fourth good-cause factor expressly requires a comparative analysis by stating that the adequacy of the dealer's facilities, inventory, and personnel must be considered "***in relation to*** those of other dealers of new motor vehicles of the same line-make." *Id.* § 2301.455(a)(4) (emphasis added). But the text of the other good-cause factors contains no such comparative language. *Id.* § 2301.455(a)(2)–(3), (5)–(7).

The Board's interpretation of Section 2301.455(a)(3) is reasonable and accords with the statute's plain language. Therefore, we defer to it here. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (courts generally uphold agency's interpretation of statute it is charged with enforcing so long as it is reasonable and does not contradict statute's plain language).

Because the ALJs relied on Bert Ogden's ***comparative*** OLP rankings, they gave little weight to Bert Ogden's ***actual*** customer-satisfaction scores, which the ALJs themselves found "tend[ed] to be closer to extraordinary than very good." The Board reasonably concluded that a comparative-ranking analysis is nonprobative of injury to the public under the facts of this case. Such an analysis renders dealers with low rankings subject to termination even when, as here, their actual customer-satisfaction scores reflect a very good or even extraordinary degree of satisfaction.

15

Despite its reasonableness, Subaru contends that the Board's correction is arbitrary and capricious because it inexplicably departs from Board precedent established by *Cecil Atkission Orange, LLC v. FCA US LLC*, MVD Docket No. 15-0015.LIC, SOAH Docket No. 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.LIC, 2016 WL 3457922 (State Office of Admin. Hearings, June 17, 2016). We disagree.

In arguing that *Atkission* establishes a policy in favor of comparative rankings, Subaru cites no finding or conclusion from the decision but rather invokes a summary of one of the party's arguments:

> FCA also points to consumer dissatisfaction with the Atkission Chrysler dealership as further evidence of public harm that is being caused by the status quo. In customer satisfaction rankings for 2015, Atkission Chrysler was ranked among the worst in Texas.

*Id.* at *17. But the decision itself does not rely on comparative customer-satisfaction rankings. Instead, it relies on actual customer behavior evidencing dissatisfaction with the dealer:

> *Regardless of whether Atkission Chrysler is the worst ranked dealership or an average ranked dealership in terms of customer satisfaction*, customers are choosing to avoid the dealership altogether and instead travel between 20-40 miles, one way, to visit other Chrysler dealerships in lieu of purchasing from Atkission Chrysler.

*Id.* at *18 (emphasis added). Thus, *Atkission* is not precedent supporting the use of comparative rankings to show injury to the public. And at least one other Board decision, *Red Bird Ford, Inc. v. Ford Motor Co.*, MVD Docket No. 93-095 (Tex. Dep't Motor Vehicles July 31, 1996), expressly disfavors their use:

> The examiner does not believe that QCP ranking is a reliable measurement of how a dealer is truly performing. The raw QCP scores indicate that Red

16

Bird has increased customer satisfaction and that overall customers are 'very satisfied' with Red Bird's service.

*Id.* at 16–17.

*Atkission* and *Red Bird* are consistent with the plain language of Section 2301.455(a)(3), which does not contemplate, much less require, a comparative analysis in assessing public injury or benefit. The Board's decision to give weight to Bert Ogden's actual customer-satisfaction scores rather than comparative rankings is consistent with Section 2301.455(a)(3) and does not depart from prior Board policy or precedent.

Subaru further contends that, in rejecting comparative rankings as evidence of injury to the public, the Board erroneously interpreted Section 2301.455(a)(3) as requiring proof that the dealership is affirmatively harming the public. Again, we disagree. The Board's conclusion that the comparative rankings failed to prove injury to the public did not impose an obligation on Subaru to prove that Bert Ogden was injuring the public; it was a recognition that Subaru had tried to do so, but with incorrect focus. *See* Tex. Occ. Code § 2301.453(a)(3) (establishing that dealer bears burden to show good cause exists to terminate franchise).

We hold that the Board, which has expertise in this industry, properly exercised its discretion in rejecting the ALJs' assessment of injury based on Bert Ogden's low comparative rankings when those rankings were inconsistent with Bert Ogden's actual customer-satisfaction scores.

### Benefits of replacement dealer

The Board determined that the ALJs misinterpreted Section 2301.455(a)(3) in finding that the injury to the public from terminating Bert Ogden "would be outweighed by the hypothetical benefit of having a new dealer." In their PFD, the ALJs found that:

17

[Subaru] has indicated that it intends to quickly install a new dealer, so any inconvenience will be brief and is outweighed by the benefit the public will realize once a new dealer is established.

In its Final Order, the Board amended the ALJs' finding to read:

[Subaru] has indicated that it intends to quickly install a new dealer, so any inconvenience will be brief.

Thus, the Board adopted the ALJs' findings that Subaru intends to quickly install a new dealer and that any inconvenience from having no dealer in the Pharr AOR will be brief. But the Board rejected the ALJs' conclusion that the public would be better served by a new dealer for three principal reasons.

First, the Board concluded that Bert Ogden had provided "significant benefits" to the public in the Pharr AOR. In making its conclusion, the Board considered the ALJs' basic fact findings showing that Bert Ogden has been a "stable and consistent" Subaru dealer for the Pharr AOR since 2009. These findings show that before Bert Ogden began operating, Subaru had struggled to maintain a dealership in the Rio Grande Valley. Between 1976 and 2009, there were eight successive Subaru dealers in the Rio Grande Valley. The average tenure of these prior dealers was just over five years. Bert Ogden has been operating for over fifteen years. Its customer-satisfaction scores are consistently high. Its facilities are adequate, and it performs warranty work for Subaru owners in the Pharr AOR, including work on older, high-mileage Subarus.

Second, the Board concluded that the public would be harmed from Bert Ogden's termination. In making its conclusion, the Board adopted the ALJs' basic fact finding that "[i]f the dealership agreement is terminated, there will be a transition period before a new dealer is in

18

place during which there will be no Subaru dealership in the Rio Grande Valley." Although the Board also adopted the ALJs' finding that the transition period would be "brief," it is nonetheless undisputed that there will be some indefinite period during which no Subaru dealership exists in the Rio Grande Valley. During this period, Subaru owners will have to drive at least to Corpus Christi or San Antonio for warranty and recall work.

Third, the Board concluded that any benefit from a new dealer is hypothetical. In making its conclusion, the Board considered the ALJs' basic fact findings showing that eight Subaru dealerships had operated unsuccessfully in the Rio Grande Valley before Bert Ogden was appointed a franchisee. The Board also considered the ALJs' finding that Subaru "did not present evidence that another dealer would perform at a higher level" than Bert Ogden.

Thus, in exercising its discretion to weigh injury or benefit to the public, the Board concluded that the nonspeculative harm from terminating Bert Ogden would outweigh any speculative benefits from Subaru's indicated intent to find a replacement.

Subaru raises a number of complaints about the Board's conclusion. Subaru first complains that "the Board erred in finding that [Subaru]'s intention to quickly install a replacement dealer is 'speculative.'" But the Board did not find that Subaru's intent was speculative. The Board's amended finding adopts the ALJs' proposed finding that Subaru "has indicated that it intends to quickly install a new dealer, so any inconvenience will be brief." Instead, the Board rejected the portion of the proposed finding that included an assumption that the public would necessarily benefit from Subaru's termination of Bert Ogden and installation of a new, unnamed, unproven Subaru dealer. The Board specifically referred to the "benefit of having a new dealer" as "hypothetical." It is true that the Board's explanation of its change includes the statement that Subaru's "intention to quickly install a new dealer . . . is speculative

19

and therefore deserves little weight." But when read in context with its adoption of the ALJs' finding that "any inconvenience will be brief," the Board's explanation is best understood to mean that the benefit of a new dealer is speculative, not that Subaru's intent to install a replacement is.

Subaru next argues that the Board's "new finding that Bert Ogden's termination would cause significant harm to consumers constitutes reversible error" because the Board identified no findings of fact or evidence that supports it and because the Board neglected to provide a rational basis for the change. Again, we disagree.

As the Board explained, the ALJs' findings show that Bert Ogden's termination would result in there being no Subaru dealership in the Rio Grande Valley for some period and, as a result, the public would be inconvenienced. The ALJs' findings further show that the nearest Subaru dealerships the public would visit for warranty or recall work during this transition period would be in San Antonio or Corpus Christi. Thus, the Board reasonably concluded that during this transition period, Subaru owners in the Rio Grande Valley needing warranty or recall work would be harmed.

Citing *Atkission and Mr. Yamaha, Inc. v. American Suzuki Motor Corp.*, MVD Docket No. 09-0043LIC, SOAH Docket No. XXX-XX-XXXX.LIC, 2011 WL 577104 (State Office of Admin. Hearings Feb. 8, 2011), Subaru contends that the Board's conclusion departs from precedent in which the Board "previously accepted as credible and relied on a distributor's intent to quickly install a new dealer as a circumstance that weighs in favor of termination." These decisions are distinguishable.

In *Atkission*, the evidence showed that local customers were bypassing the local dealer and travelling to dealerships twenty to forty miles away. 2016 WL 3457922 at *17.

20

Because the customers were already bypassing the existing dealer, termination of the existing dealer would cause no additional inconvenience.

In *Mr. Yamaha*, the evidence showed that there existed some sort of dispute between the two co-owners of the protesting dealership and that one of the co-owners had carried weapons onto the premises and threatened to shoot the other co-owner. 2011 WL 577104, at *15. In her analysis, the ALJ explained that the dispute between the two owners "took on dangerous qualities that could have endangered the public, including threats of violence at the dealership." *Id.* at *16. The ALJ further explained that during the transition period between the termination of the existing dealership and the installation of a new one, customers would be able to visit another dealership that was just a "short drive" away. *Id.*

So unlike here, in both *Atkission* and *Mr. Yamaha*, there existed reasonably close alternative dealerships that consumers could visit during any transition period between the closing of the protesting dealership and the opening of its replacement. And unlike here, in *Mr. Yamaha*, keeping the protesting dealership open could have resulted in actual violence being done to the public.

Evaluating "injury or benefit to the public" necessarily requires the Board to weigh the benefits a dealership provides the public and the detrimental impacts on the public from termination. In *Atkission* and *Mr. Yamaha*, the Board did not establish a policy of always weighing a distributor's intent to quickly establish a new dealership in favor of termination. Instead, the Board followed the directive of Section 2301.455: it considered "all existing circumstances" in deciding whether the "public injury or benefit" factor weighed in favor of termination.

21

The status quo evidence showed a stable, long-term Subaru dealership with a record superior to that of its eight predecessors—as compared to hypothetical benefits from Subaru's "indicated" intent to install some unknown replacement that no evidence showed would outperform Bert Ogden. The Board reasonably afforded more weight to the non-speculative benefits of the status quo and to the non-speculative injury that termination would cause to consumers in the Rio Grande Valley—leaving them with no Subaru dealership providing convenient access to warranty, recall, and repair services for at least some amount of time. We conclude that the Board did not err in rejecting the ALJs' conclusions, and Subaru's substantial rights were not prejudiced by the Board's change to the conclusions.

**Adequacy of dealer's facilities, equipment, parts, and personnel**

We now consider Subaru's complaints about the Board's conclusion that the fourth factor, "the adequacy of [Bert Ogden]'s service facilities, equipment, parts, and personnel in relation to those of other dealers of new motor vehicles of the same line-make," Tex. Occ. Code § 2301.455(a)(4), is neutral.

*Inventory*

In its Final Order, the Board explained that "the inadequacy of the parts inventory in this case carries less significance in the context of the modern motor vehicle industry where there is fast shipping and delivery of parts from manufacturers to dealers that allows dealers to get parts as needed." Subaru characterizes the Board's explanation as "an additional finding of basic fact." Subaru contends that the Board exceeded its statutory authority by making this new "finding." We disagree with Subaru's characterization.

22

Basic facts "answer the questions of who did what, when, how, why, with what motive or intent." *Hyundai Motor Am.*, 581 S.W.3d at 838. The Board's explanation does not say anything about what Bert Ogden did or why. The Board's explanation is not a basic fact finding but a conclusion reasonably drawn from its evaluation of the basic facts based on its industry expertise.

The members of the Board include two franchised dealers, one independent (or used vehicle) dealer, and one representative of a manufacturer or distributor. Tex. Transp. Code § 1001.021(b). In a contested case, "[t]he special skills or knowledge of the state agency and its staff may be used in evaluating the evidence." Tex. Gov't Code § 2001.090(d). Thus, we afford the Board members' "expertise substantial deference in interpreting the facts . . . ." *Centerpoint Energy Houston Elec., LLC v. Public Util. Comm'n,* 212 S.W.3d 389, 399 (Tex. App.—Austin 2006, pet. granted, judgm't vacated, w.r.m.).

Here, in determining that the comparative inadequacy of Bert Ogden's parts inventory carried less weight than did its service facilities, the Board reasonably drew upon its special knowledge of how parts are distributed in the motor-vehicle industry. But it did not use its expertise as a substitute for evidence or as the basis for new basic fact findings. It did not revisit the basic fact that Bert Ogden's parts inventory was comparatively inadequate to that of other Subaru dealers. Instead, the Board weighed the significance of different components of the adequacy factor in light of existing circumstances in the industry. In weighing the components in this manner, the Board did not make a basic fact finding; it made a prudential judgment within its expertise and discretion when interpreting the facts.

Subaru complains that "not a single finding of fact in the PFD . . . addresses the shipping time for parts or finds that parts inventory is insignificant." But the absence of such

findings did not prevent the Board from using its industry expertise to evaluate the significance of basic facts. Industry expertise and the authority to make the final decision are vested in the Board, not in SOAH. *See* 43 Tex. Admin. Code § 215.63(c); *see also* Tex. Gov't Code § 2001.090(d).

Next, Subaru contends that the Board's explanation for assigning less weight to the inadequacy of Bert Ogden's parts inventory is a "finding" unsupported by substantial evidence and in violation of Section 2001.141 of the Government Code. Tex. Gov't Code § 2001.141(c) ("Findings of fact may be based only on the evidence and on matters that are officially noticed."). Subaru's argument lacks merit because the significance—the weight—the Board gave the parts inventory subfactor is not a basic fact finding but the Board's conclusion based on its evaluation of the basic facts and its industry expertise.

Subaru cites the PFD in asserting that the ALJs "found" that a dealer's parts inventory is relevant to customer service, that repair or service can be performed more quickly than if the parts must be ordered, and that other Subaru dealers were increasing their parts-inventory levels. But none of these "findings" contradict the Board's evaluation of the parts-inventory component. The Board did not say that having a larger parts inventory was not desirable. The Board recognized from the basic facts that demand for service and repair in Bert Ogden's market area could be handled with a lower-than-average parts inventory because of modern shipping and delivery service.

Subaru's final complaint about the parts-inventory assessment is that it was arbitrary and capricious. Subaru contends that the Board's conclusion "that parts inventory carries less significance in the modern motor vehicle industry" constitutes a "new statement of

24

policy" making parts inventory "no longer a significant consideration." Subaru mischaracterizes what the Board decided.

The Board neither said nor implied that parts inventory is no longer "a significant consideration" in a termination case. The significance of the comparative adequacy or inadequacy of a dealer's parts inventory depends on the particular facts and circumstances of each termination case. Here, the Board made no policy statement applicable to all termination cases. It stated its reasons for giving lesser weight to one component of the adequacy factor in light of this case's particular facts and circumstances.

Subaru criticizes the Board for not giving pre-hearing notice of the weight the Board would assign to the parts-inventory component, but the proper weight of any factor, or its components, cannot be known until the Board evaluates the facts and circumstances of each case.

### *Personnel*

In its Final Order, the Board determined that the ALJs had misinterpreted Section 2301.455(a)(4) "by focusing primarily on exclusive personnel, rather than on the total number of Bert Ogden personnel available to assist and service vehicles for its customers." The Board explained that Section 2301.455(a)(4) "does not impose an exclusivity requirement" on personnel. Nevertheless, the Board continued, five of the ALJs' six findings on personnel focused on Bert Ogden's lack of exclusive personnel. But the lack of Subaru-exclusive personnel does not show that Bert Ogden's "personnel were inadequate to meet its customers' needs since shared personnel served Subaru customers" as well. Thus, the Board adopted the ALJs' finding that Bert Ogden had inadequate personnel, but it determined that this inadequacy is "not a significant factor and carries little weight" under the facts of this case.

25

The Board gave less weight to the comparative inadequacy of Bert Ogden's service personnel because the ALJs focused their attention on the number of Bert Ogden's parts-and-service personnel ***dedicated exclusively*** to serving the Subaru brand rather than on the number of Subaru personnel available to service Bert Ogden's customers. It is undisputed that Bert Ogden's multiple franchises share some service personnel.

Subaru contends that it is "simply untrue" that the ALJs focused primarily on exclusive personnel and that exclusivity is nevertheless a "highly relevant and mandatory consideration" under Section 2301.455(a)(4). We disagree.

As just recounted, five of the ALJs' six basic fact findings concerning personnel deal with Bert Ogden's comparative lack of "Subaru-exclusive" personnel. The ALJs did, in fact, focus primarily on exclusive personnel.

The lack of relevance of "exclusivity" to the personnel component is evident from the fact that the legislature did not include it in Section 2301.455(a)(4). That statute requires the Board to consider "***personnel*** in relation to those of other dealers of new motor vehicles of the same line-make." The Board reasonably construed Section 2301.455(a)(4) as requiring consideration of ***all*** personnel serving the dealership's customers, not just personnel who work only on a single line-make. We decline to construe Section 2301.455(a)(4) as requiring the Board to focus on dealership personnel dedicated exclusively to one line-make.

The Board assigned little significance to Bert Ogden's comparative lack of "Subaru-exclusive" personnel because that fact did not establish that Bert Ogden's personnel failed to mee the needs of its Subaru customers. Subaru argues the Board's reasoning violates Section 2301.455(a)(4) because the statute requires a comparison of Bert Ogden's personnel to the personnel of other Subaru dealers and that the Board, inexplicably, ignored fact findings that

26

Bert Ogden had comparatively higher turnover in its service and parts departments, had not increased the number of service employees and dedicated service and parts managers, and had lower service-satisfaction scores than other dealers. Subaru's argument mischaracterizes the Board's actions.

The Board did not revisit whether Bert Ogden's personnel were adequate in relation to other Subaru dealers. It adopted the basic findings showing Bert Ogden's personnel to be comparatively inadequate. But in assigning relative weight to that component the Board considered all existing circumstances.

The distribution and sale of motor vehicles vitally affects the public interest. Tex. Occ. Code § 2301.001. Bert Ogden has been a stable Subaru dealership serving the Rio Grande Valley for fifteen years and6 has been providing convenient access to Subaru sales, warranty, and recall service to consumers in the Valley. The Board reasonably concluded this to be highly relevant to the ultimate question whether good cause exists for terminating the dealership. The Board properly exercised its discretion in evaluating the relative weight to be given the personnel component in light of these circumstances.

### *Facilities*

In its Final Order, the Board determined that the ALJs misinterpreted Section 2301.455(a)(4) in weighing the adequacy of Bert Ogden's facilities against the inadequacy of its equipment, parts, and personnel. The Board explained that "[t]he adequacy of the facilities is very important to the public's experience in the dealership." Thus, the Board concluded, "[w]hen the adequacy of the facilities is weighted appropriately against the inadequacy in

27

equipment, parts, and exclusive personnel, the facilities offset the less-significant factors of equipment, parts and personnel."

Subaru argues that the Board's determination is arbitrary and capricious because it establishes a new policy that adequate service facilities offset inadequate equipment, parts, and personnel. Subaru contends that this alleged new policy departs from precedent established by *Mr. Yamaha*, 2011 WL 577104, and *All Star Imports v. Mazda Motor of N. Am.*, MVD Docket No. 19-0015-LIC, SOAH Docket No. 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.LIC, 2022 WL 22902800 (State Office Admin. Hearings Jan. 9, 2022). Subaru emphasizes that in these prior decisions, the Board did not conclude that adequate service facilities were "very important" or otherwise offset the inadequacy of the other components. In fact, in both decisions, the dealer's inadequate personnel alone were found to be sufficient for the factor to weigh in favor of termination.

In *Mr. Yamaha*, the ALJ found that the dealer had failed to train its service technicians. And in *All Star*, the ALJ found that the one of the dealer's service technicians fraudulently reported replacing defective airbags when he had failed to do so. Here, the ALJs made no findings that Bert Ogden's service personnel were inadequately trained or performed inadequate, much less fraudulent, work. The serious personnel issues in *Mr. Yamaha* and *All Star* are absent from this case.

Thus, those decisions are not inconsistent with the Board's final order here. The Board used its industry expertise to weigh and balance the various components of the adequacy factor and to conclude that the comparative adequacy of Bert Ogden's facilities carried greater weight than the comparative inadequacy of its equipment, parts, and personnel.

Subaru's argument fails to appreciate that the assignment of weight to the various Section 2301.455(a) factors—as well as to each of the (a)(4) subfactors—is heavily dependent on

28

the facts of each particular case. It is not the case that the weight assigned to one factor (or subfactor) in one case will always be the same in other cases or will always bear the same relation to each other factor (or subfactor) in every case. The weight to be accorded to each subfactor and factor is a product of the circumstances of each case.

Subaru argues that it is "nonsensical" for the Board to conclude that Bert Ogden's facilities have a greater impact on the public than "consistently inadequate service personnel, parts inventory, and equipment." But the evidence before the Board was that Bert Ogden's customer satisfaction scores verged on "extraordinary" and that Bert Ogden honors Subaru warranties. Dealer compliance with warranties is one of Chapter 2301's primary purposes and an enumerated "good cause" factor. Tex. Occ. Code § 2301.001(2). Given these circumstances, the Board reasonably concluded that the comparative adequacy of the facilities of the only Subaru dealership in the Rio Grande Valley outweighed any *comparative* inadequacy in parts, personnel, and equipment.

**Ultimate determination of failure to show good cause**

In the Final Order, in addition to explaining its evaluation of the ALJs' analysis, findings, and conclusions, the Board made additional conclusions of law to assign appropriate weight to the various factors it was required to consider and to set out its ultimate conclusions. Subaru contends that (1) these conclusions improperly changed agency policy after the hearing, and (2) the Board did not adequately explain its reasons for drawing a different conclusion than the ALJs did.

As previously discussed, the Board's decision in this case established no new policies about the assignment of weight to any of the good-cause factors. Although Subaru

contends that the Board's explanation of its good-cause determination is deficient, the Board explained its changes to the ALJs' findings and conclusions it changed, and explained that, in light of those changes, the three factors that weigh in favor of termination—because they affected only Bert Ogden and Subaru—were outweighed by the two factors that weighed heavily against termination, which affected the public.

Chapter 2301 and the APA give the Board, not SOAH, the exclusive authority to make the ultimate findings and conclusions of law in franchise-termination cases. The Board's rejection of the ALJs' conclusions on the weight of several good-cause factors and the Board's adoption of revised conclusions of law were not arbitrary, capricious, or "policy shifts." The Board explained the factual bases and legal rationale for its changes, as required by the APA and the precedents of this Court. In evaluating the "injury or benefit to the public" good-cause factor, the Board considered actual, nonspeculative harm to the public that would ensue if Bert Ogden's franchise were terminated and reasonably assigned it more weight than the other good-cause factors. The Board cited the following specific basic fact findings supporting its assignment of relative weight:

- Bert Ogden has been a stable and consistent Subaru dealer for the Pharr AOR since 2009;

- Bert Ogden's facilities are adequate in relation to those of other dealers;

- Bert Ogden has been performing warranty work for other Subaru owners in the AOR, including on older high-mileage Subarus;

- Bert Ogden's termination would result in a transition period during which there would be no Subaru dealer in the Rio Grande Valley to sell new Subaru vehicles and perform service work, including warranty and recall work;

- during this transition period, Bert Ogden's termination would require the public to travel to Corpus Christi, San Antonio, or farther to buy a Subaru or to get warranty and recall work; and

- there is no evidence—and therefore no reason to believe—that a replacement dealer would perform at a higher level than Bert Ogden.

The inferences the Board drew from these facts were reasonable and the weight the Board gave each good-cause factor was within its authority.

## CONCLUSION

We hold that Subaru has failed to show the Board's final order prejudiced its substantial rights.  Therefore, we affirm.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Theofanis, and Ellis

Affirmed

Filed:  July 18, 2025

31